**Frank Duane LUSSIER, petitioner, Appellant,**

v.

**STATE of Minnesota, Respondent.**

No. A–11–2023.

Supreme Court of Minnesota.

Oct. 10, 2012.

2001).

David W. Merchant, Chief Appellate Public Defender, G. Tony Atwal, Assistant State Public Defender, St. Paul, MN, for appellant.

Lori Swanson, Attorney General, St. Paul, MN; and Timothy R. Faver, Beltrami County Attorney, Bemidji, MN, for respondent.

## OPINION

PAGE, Justice.

On March 17, 2003, appellant Frank Duane Lussier fatally stabbed his wife, Sharlene. On April 8, 2003, he was charged by grand jury indictment with first-degree murder while committing domestic abuse, in violation of Minn.Stat. § 609.185(a)(6) (2010). Lussier later pled guilty to the charged offense and was sentenced to life imprisonment with the possibility of parole. He did not appeal. He filed this postconviction petition, alleging that his guilty plea was invalid because it lacked a proper factual foundation. The State did not respond to Lussier's petition nor has it responded to Lussier's appeal to our court. The postconviction court denied relief on the ground that the petition was untimely and lacked substantive merit. We need not address the issues of whether Lussier's postconviction petition was untimely under Minn.Stat. § 590.01, subd. 4(a) (2010), or whether it fell within the interests-of-justice exception of Minn.Stat. § 590.01, subd. 4(b)(5) (2010), because the petition lacks substantive merit.[1] Having

---

1. Because Lussier's postconviction petition lacks substantive merit, his case does not squarely present the issue of whether the statute of limitations set forth in Minn.Stat. § 590.01, subd. 4(a), is an affirmative defense that is subject to waiver, like the statute of limitations set forth in Minn.Stat. § 590.01, subd. 4(c) (2010). *See Carlton v. State,* 816

concluded that the petition lacks substantive merit, we affirm the postconviction court's denial of relief and decline to reach Lussier's other arguments.

The facts as discussed below are taken from the record developed at Lussier's plea hearing, which includes a transcript of the grand jury proceedings that resulted in Lussier's indictment. Lussier and Sharlene were married in 1993 and together they had one child. At the time of Sharlene's death, Sharlene, Lussier, their 11–year–old son, and Sharlene's two daughters and one son from previous relationships lived together in a downstairs apartment in Sharlene's mother's house.

Various witnesses testified before the grand jury regarding Sharlene's death. Sharlene's oldest daughter, J.M., who was eight months pregnant at the time of the murder, testified as an eyewitness to her mother's death. She testified that the circumstances leading up to Sharlene's death began in the basement apartment where they lived. According to J.M., Lussier was upset because J.M. and Sharlene were planning to go out of town. Lussier began raising his voice and arguing with Sharlene. While Sharlene and Lussier were sitting at the kitchen table, Lussier asked Sharlene if the marriage was over, to which Sharlene replied, "so what if it is." Lussier began to punch Sharlene on her head and body and, at some point, J.M. jumped in front of her mother to block Lussier's blows. As a result, Lussier "grabbed [J.M.] by her hair [and] threw [J.M.] on the floor and started hitting [J.M.] on [J.M.'s] head." Sharlene told Lussier to stop because J.M. was pregnant; in response, Lussier ceased hitting J.M. and began hitting Sharlene again. Eventually, Lussier "pulled out a bunch of knives" and began swinging at Sharlene and J.M. He looked for other knives and eventually "had the biggest knife in his hand." Lussier told J.M. to get out of the way and made motions like he was going to stab her. Sharlene pushed J.M. out of the way and Lussier stabbed her. Lussier then cut his own neck. Other witnesses, who were in the house at the time, testified that when they came to the basement after the stabbing, they observed that Sharlene was still alive when they first saw her.

The grand jury heard a recording of a 911 call made by Sharlene's 12–year–old son on the day of Sharlene's death. In that call, Sharlene's son reported that his mother had been stabbed; that his mother was lying on the floor, "all bloody"; and that he had seen Lussier with a large butcher knife. When the police arrived, they found Sharlene lying on the basement floor, covered in blood. The police were told that Lussier had stabbed Sharlene and that he was in a room in the back of the house. A police officer went to that room and found Lussier sitting on the edge of a bed with a knife at his throat and attempting to cut himself. A recording taken from the officer's body microphone was played for the grand jury; the recording indicates that the officer observed Lussier bleeding, that the officer repeatedly instructed Lussier to put the knife down, and that Lussier said, "Just shoot me," "I wanna die," and "I hurt my wife." Lussier was eventually taken into custody.

During the grand jury proceedings, multiple witnesses testified about previous incidents of domestic abuse committed by Lussier. J.M. testified that in 1995, Lussier pushed Sharlene down the stairs, and then grabbed Sharlene by her arms and dragged her into a van. Later that same

N.W.2d 590, 606 (Minn.2012) (holding that the time limit in subdivision 4(c) does not operate as a jurisdictional bar, and therefore is subject to waiver).

day, Lussier argued with Sharlene and "dragged her up [the] stairs." Also in 1995, Sharlene's sister observed Lussier smash a car window, grab Sharlene by her throat, and try to pull her out of the car. The grand jury also heard that on April 13, 1997, Sharlene sought medical attention for injuries she said she sustained because Lussier had hit her in the face, an incident for which Lussier was later convicted of felony third-degree assault. On August 4, 2002, the police received a report that Lussier had threatened Sharlene with a knife. Lussier was later convicted of gross misdemeanor domestic assault as a result of that incident. The testimony indicates that these were not isolated incidents of abuse. Sharlene's sister testified that there were "other times that I know she had stated that he was really violent with her and had forced sex on her and had bruises on her body." Sharlene's best friend testified that Lussier "many times" would "become violent just in front of anybody." The friend also testified that Lussier "was always very verbally abusive to [Sharlene].... [T]hat was almost daily." Sharlene's mother testified that "all the time we had to rush out to her house ... when he would destroy the house" by "punch[ing] ... holes in the walls."

During his guilty plea hearing, Lussier, answering questions put to him by his attorney, testified that on the afternoon of March 17, 2003, he argued with Sharlene and J.M., and that during that argument he hit Sharlene once. At some point, wanting to take his own life, he picked up a knife and put it to his chest. According to Lussier, when J.M. told him "No" and held onto his hands, he "lunged and pushed them away" resulting in Sharlene being stabbed. During his testimony, Lussier acknowledged that his actions at the time he stabbed Sharlene "showed an extreme indifference to human life." He also acknowledged the 1997 and 2002 as-

sault convictions. At the guilty plea hearing, the State moved to admit the grand jury transcript to supplement the factual basis for Lussier's plea. Lussier did not object to the motion, which the district court ultimately granted. After the transcript was admitted, the court asked Lussier's counsel the following question and received the following answer:

Q: And [Lussier] would agree ... that if this had gone forward to trial, that the witnesses at the trial would have testified much in accordance with the Grand Jury testimony?

A: Your Honor, he has not seen the Grand Jury transcript. But he has seen all the reports. And we have gone over in detail what the witnesses would say, what they saw, and how that affected his case. So we would agree with that.

Lussier did not object to his counsel's answer.

The record indicates that the district court intended to seek additional information from Lussier to establish the factual basis for the "extreme indifference to human life" element of first-degree domestic abuse murder. But after the court granted the State's motion to admit the grand jury transcript, there was no further discussion of the "extreme indifference" element. Subsequently, the court accepted Lussier's guilty plea and sentenced him to life in prison with the possibility of parole.

On February 7, 2011, Lussier, not having appealed, filed a pro se motion to withdraw his guilty plea. On May 19, 2011, he filed a petition for postconviction relief. Lussier did not request an evidentiary hearing. In the petition, Lussier argued that his guilty plea lacked a proper factual basis because the evidence did not establish two elements of the offense: "past pattern of domestic abuse" and "extreme indifference to human life."

According to Lussier's argument, the admission of the grand jury transcript was insufficient to establish these elements of the offense because "there was no on-the-record recitation of facts contained in the transcript that were relevant to the elements of the charged murder offense." He further argued that he did not admit or affirm the facts contained in the grand jury transcript. As to timeliness, Lussier argued that his motion to withdraw his guilty plea was timely under *James v. State*, 699 N.W.2d 723 (Minn.2005). Lussier also argued that his motion was timely under the postconviction statute, Minn.Stat. § 590.01 (2010), because his claim is not frivolous and is in the interests of justice. Alternatively, Lussier argued that the time limitation in section 590.01, subdivision 4(a)(1), is unconstitutional because it denies a defendant his due process right to one review of his conviction under the Minnesota Constitution and because it violates the separation of powers.

▇▇ The postconviction court denied relief. The court first concluded that Lussier's petition was untimely under section 590.01, subdivision 4(a). Under Minn.Stat. § 590.01, subd. 4(a), "[n]o petition for postconviction relief may be filed more than two years after the later of: (1) the entry of judgment of conviction or sentence if no direct appeal is filed; or (2) an appellate court's disposition of petitioner's direct appeal." [2] A person whose conviction became final before August 1, 2005, had until July 31, 2007, to file a timely postconviction petition. Act of June 2, 2005, ch. 136, art. 14, § 13, 2005 Minn. Laws 901, 1098; *see also Johnson v. State*, 801 N.W.2d 173, 177 (Minn.2011). Because Lussier's conviction became final before August 1, 2005, his postconviction petition had to be filed on or before July 31, 2007. Here, it is undisputed that Lussier's petition was not filed until 2011. Therefore, the court concluded that his petition, on its face, was untimely.

The subdivision 4(a) time limitation is subject to five exceptions found in subdivision 4(b)(5). *See* Minn.Stat. § 590.01, subd. 4(b). Under Minn.Stat. § 590.01,

---

**2.** Lussier argues that the timeliness of his motion to withdraw his guilty plea is governed by the rule we applied in *James. See James v. State*, 699 N.W.2d 723, 728 (Minn. 2005) ("[T]he timeliness of a petition to withdraw a guilty plea is a *relevant* consideration in determining whether that relief should be granted." (emphasis added)); *see also* Minn. R.Crim. P. 15.05, subd. 1 ("At any time the court must allow a defendant to withdraw a guilty plea upon a *timely* motion and proof to the satisfaction of the court that withdrawal is necessary to correct a manifest injustice." (emphasis added)). We disagree. For a defendant who seeks to withdraw his guilty plea under Minn. R.Crim. P. 15.05 after he has been sentenced, "the motion to withdraw the plea must be raised in a petition for postconviction relief." *James*, 699 N.W.2d at 727. In *James*, therefore, we applied the principles governing the timeliness of postconviction petitions. *See id.* at 728 (concluding that the timeliness of a motion to withdraw a guilty plea in a postconviction petition is treated the same as "the manner in which delays in filing petitions for postconviction relief are treated"). We decided *James* before the time limitations in Minn.Stat. § 590.01 became effective. Act of June 2, 2005, ch. 136, art. 14, § 13, 2005 Minn. Laws 901, 1098 ("This section is effective August 1, 2005."). We reaffirm that a motion to withdraw a guilty plea made after sentencing must be raised in a petition for postconviction relief and the timeliness of such a motion is treated the same as "the manner in which delays in filing petitions for postconviction relief are treated." As a result, the timeliness requirements found in section 590.01 apply with equal force to Lussier's petition. *See also Johnson v. State*, 801 N.W.2d 173, 176–77 (Minn.2011) (applying the time limitations in section 590.01 to Johnson's motion to correct or reduce his sentence on the basis that his guilty plea was invalid).

subd. 4(b)(5), the postconviction court may hear a petition that is untimely under subdivision 4(a) if "the petitioner establishes to the satisfaction of the court that the petition is not frivolous and is in the interests of justice." The court, after concluding that Lussier's petition was untimely under section 590.01, subdivision 4(a), proceeded to consider whether Lussier satisfied subdivision 4(b)(5)'s interests-of-justice exception and, after a thorough analysis of the record, concluded that the petition lacked substantive merit because the past-pattern-of-domestic-abuse and extreme-indifference-to-human-life elements of first-degree domestic abuse murder were supported by the record. In analyzing the merits to determine whether the interests-of-justice exception applied, the court rejected Lussier's argument that the district court improperly relied on the grand jury transcript, concluding that "[t]he grand jury transcript and police reports are ... valid parts of the plea and this Court will use them to evaluate the factual basis for Petitioner's plea." Regarding the elements of the offense, the court concluded, "the State supplied an ample, even overwhelming, factual basis to support a finding of a past pattern of domestic abuse" and, "[h]ad this case gone to trial, ample evidence existed for a jury to find an extreme indifference to human life."

With respect to the "past pattern of domestic abuse" element, the court found that the record was "replete with overwhelming evidence of numerous, on-going acts of domestic abuse, including violent assaults committed by [Lussier] against his wife." The court identified five discrete incidents of abuse, occurring between 1995 and 2002, which were mentioned either in the grand jury testimony, during the plea colloquy, or both: (1) in 1995, Lussier smashed the window of a car in which Sharlene was sitting, grabbed Sharlene by the throat, and tried to pull her out of the car through the broken window; (2) in 1995, Lussier pushed Sharlene down the stairs, grabbed her by her arms, and dragged her into a vehicle; (3) in 1997, Lussier punched Sharlene in the eye, causing a fracture in her eye socket, a broken nose, a bruised eye, and a chipped tooth; (4) in 1997, Lussier threatened to beat up Sharlene; and (5) in 2002, Lussier used a knife to threaten to kill Sharlene. The court also discussed the grand jury testimony of three witnesses that connected the discrete incidents "into a pattern of abuse." Those witnesses—Sharlene's sister, best friend, and mother—testified that there were "plenty of times" and "so many times" that Lussier was violent with Sharlene in front of others.

With respect to the "extreme indifference to human life" element, the court concluded that Lussier's "murderous assault showed both recklessness and a complete lack of any concern." The court reasoned that the circumstances leading up to Sharlene's death—Lussier punching Sharlene, grabbing J.M. by her hair and hitting her, and swinging knives at Sharlene and J.M.—demonstrated an extreme indifference to human life. In addition, the killing occurred in the presence of two young children, and there was no evidence that Lussier attempted to aid his wife after he stabbed her. The court also rejected Lussier's argument that the subdivision 4(a) time limitation is unconstitutional. Finally, the court separately concluded that Lussier's petition was untimely under Minn. R.Crim. P. 15.05. The court also concluded that the postconviction statute is constitutional.

Lussier raises the following arguments on appeal to our court: (1) Lussier's guilty plea is invalid because it does not contain a proper factual basis that he committed a "past pattern of domestic abuse" or mani-

fested an "extreme indifference to human life"; (2) Lussier's Minn. R.Crim. P. 15.05 motion to withdraw his guilty plea is timely and must be granted to correct a manifest injustice; (3) Minn. Stat. § 590.01, subd. 4(a)(1), is unconstitutional because it denies a convicted defendant his due process right to one review of his conviction and violates the separation of powers; and (4) we should exercise our inherent authority in the interests of justice to review Lussier's claims.

 When reviewing a postconviction court's decision, we examine "only whether the postconviction court's findings are supported by sufficient evidence." *Leake v. State*, 737 N.W.2d 531, 535 (Minn.2007). We "will reverse a decision of [the] postconviction court only if that court abused its discretion." *Id.*

 Lussier first argues that he should be allowed to withdraw his guilty plea because his plea was not accurate. According to Lussier, his plea was inaccurate because the plea hearing record does not contain a proper factual basis for two elements of first-degree domestic abuse murder: "past pattern of domestic abuse" and "extreme indifference to human life." Separately, Lussier argues that the proper factual basis to support an accurate plea must be in the plea hearing transcript; and that here, the admission of the grand jury transcript was not sufficient to establish a proper factual basis because there was no on-the-record disclosure of facts contained in the grand jury transcript. He further argues that to the extent the facts contained in the grand jury transcript are sufficient to establish a factual basis for his plea, he did not admit to those facts. As noted above, the postconviction court concluded that Lussier's claim that he was entitled to withdraw his plea lacked substantive merit. Because we conclude that the postconviction court's conclusion

that Lussier's petition lacks substantive merit is supported by the record, we affirm the postconviction court's denial of postconviction relief.

 Among other requirements, a constitutionally valid guilty plea must be accurate. *State v. Raleigh*, 778 N.W.2d 90, 94 (Minn.2010). "To be accurate, a plea must be established on a proper factual basis." *Id.* The purpose of the accuracy requirement is to "protect[ ] a defendant from pleading guilty to a more serious offense than that for which he could be convicted if he insisted on his right to trial." *Id.* The defendant bears the burden to establish that his plea was invalid. *Id.* Whether a plea is valid is a question of law which we review de novo. *Id.*

Lussier pled guilty to first-degree murder while committing domestic abuse. A person is guilty of that offense if he "causes the death of a human being while committing domestic abuse, when the perpetrator has engaged in a past pattern of domestic abuse upon the victim or upon another family or household member and the death occurs under circumstances manifesting an extreme indifference to human life." Minn.Stat. § 609.185(a)(6).

 We have held that a proper factual basis must be established by the record. *See Kelsey v. State*, 298 Minn. 531, 532, 214 N.W.2d 236, 237 (1974) (per curiam) ("[T]here must be sufficient facts *on the record* to support a conclusion that defendant's conduct falls within the charge to which he desires to plead guilty." (emphasis added)). We have noted that a proper factual basis may be established by written statements of witnesses, *see State v. Genereux*, 272 N.W.2d 33, 34 n. 2 (Minn.1978) (noting that a factual basis may be established by including "written statements of witnesses as exhibits"), and that "[t]he factual-basis requirement is satisfied if the

record contains a showing that there is credible evidence available which would support a jury verdict that defendant is guilty of at least as great a crime as that to which he pled guilty," *id.* at 34. We have previously observed that the "typical[ ]" way a district court satisfies the accuracy requirement is "by asking the defendant to express in his own words what happened." *Raleigh,* 778 N.W.2d at 94. And we have cautioned against the use of exclusively leading questions to establish a proper factual basis for a guilty plea. *See, e.g., State v. Ecker,* 524 N.W.2d 712, 716 (Minn.1994) ("The trial judge must be particularly attentive to situations in which a defendant is pleading guilty and is asked only leading questions by counsel."); *see also Raleigh,* 778 N.W.2d at 95 (noting "[w]e have long discouraged [the] practice" of relying exclusively on leading questions to establish a proper factual basis for a guilty plea). Nevertheless, even if a district court does not "elicit proper responses," a defendant may not withdraw his plea "if the record contains sufficient evidence to support the conviction." *Raleigh,* 778 N.W.2d at 94. Indeed, the plea petition and colloquy may be supplemented by other evidence to establish the factual basis for a plea. *See State v. Trott,* 338 N.W.2d 248, 252 (Minn.1983) (concluding that the record as a whole, which included the complaint and photos of the victim's injuries taken at the hospital, was sufficient to establish factual basis for guilty plea); *State v. Hoaglund,* 307 Minn. 322, 327 n. 9, 240 N.W.2d 4, 6 n. 9 (1976) (holding that the record as a whole, which included PSI, was insufficient to establish factual basis for guilty plea); *Burnett v. State,* 292 Minn. 485, 486, 195 N.W.2d 187, 188 (1972) (noting that the presentence investigation contained defendant's version of crime in detail and, while its use is disapproved, constituted an adequate factual basis for guilty plea). Further, we

have never required that the factual basis for the plea appear in the plea hearing transcript verbatim, and we decline to do so here. In this case, the grand jury transcript, although not set out verbatim in the transcript of Lussier's guilty plea hearing, was admitted into the record. Lussier does not contend otherwise, nor does he contend that the grand jury transcript is in the record improperly. Thus, in this case, we conclude that the factual basis supporting Lussier's plea may be based on the grand jury transcript, which was properly admitted into the record without objection during Lussier's plea hearing.

▆▆▆▆ Having concluded that the factual basis for Lussier's guilty plea may be based on the grand jury transcript admitted in this case, we turn to Lussier's argument that the evidence does not provide a proper factual basis to support two elements of domestic abuse murder: "past pattern of domestic abuse" and "extreme indifference to human life." In order to be guilty of first-degree domestic abuse murder, the State must prove, beyond a reasonable doubt, that the defendant engaged in a "past pattern of domestic abuse." *State v. Sanchez–Diaz,* 683 N.W.2d 824, 832 (Minn.2004); *see also* Minn.Stat. § 609.185, subd. (a)(6). A pattern involves more than one act. *State v. Grube,* 531 N.W.2d 484, 491 (Minn.1995) ("A lone act ... does not and cannot constitute a pattern."). Further, there must be evidence tying the previous acts together into a "'regular way of acting.'" *State v. Clark,* 739 N.W.2d 412, 419 (Minn.2007) (quoting *State v. Robinson,* 539 N.W.2d 231, 237 (Minn.1995)); *see also Sanchez–Diaz,* 683 N.W.2d at 832–33 (holding that a "past pattern" was established when (1) there was evidence of one incident in which the defendant choked the victim, (2) the defendant admitted previously slapping the vic-

tim at least twice, and (3) the defendant's statement "everybody knew how we lived" clearly indicated that abuse "was part of the regular way in which he related to the victim"). The previous incidents must also be proximate in time to the charged offense to establish a "past pattern." *See Clark*, 739 N.W.2d at 421–22 (holding that two incidents occurring 13 to 15 years before the murder were not sufficiently proximate in time to constitute underlying domestic abuse offenses, and two more recent incidents—within same year of the murder—were not sufficient on their own to establish a past pattern of domestic abuse); *see also State v. Cross*, 577 N.W.2d 721, 727 n. 3 (Minn.1998) (noting that events establishing a "past pattern of domestic abuse" "must be sufficiently proximate in time to constitute a 'pattern'"). "[S]ome incidents [may be] too distant in time from each other to constitute a pattern or a regular way of acting." *Clark*, 739 N.W.2d at 421.

Here, the postconviction court relied on evidence of at least five previous incidents of domestic abuse. All of the incidents occurred between 1995 and 2002, and each incident is supported by the record. To the extent that Lussier argues that these incidents are unrelated and too remote in time to be considered part of a "past pattern," we disagree. We are satisfied, based on our review of the record, that the five incidents, which occurred over a seven-year period, when viewed together, constitute a regular way of acting sufficient to constitute a past pattern. Moreover, there is ample additional evidence in the record supporting a pattern of domestic abuse. Grand jury witnesses testified that Lussier was violent with Sharlene, forced sex on her, bruised her body, became violent with Sharlene many times, was verbally abusive towards her daily, and regularly "destroy[ed] the house" by "punch[ing] ... holes in the walls." Thus, there is ample

credible evidence in the record that would support a jury verdict that Lussier is guilty of first-degree domestic abuse murder. *See Genereux*, 272 N.W.2d at 34. Given the evidence in the record, we conclude that the postconviction court did not abuse its discretion when it found that there was a proper factual basis to support the conclusion that Lussier had engaged in a "past pattern of domestic abuse."

Extreme indifference to human life involves "recklessness or at a minimum, gross negligence." *State v. Bird*, 734 N.W.2d 664, 677 (Minn.2007). Here, not only did Lussier admit that his actions showed an extreme indifference to human life, there is evidence in the record, in the form of grand jury testimony, establishing that Lussier's actions were "reckless[ ] or at a minimum, gross[ly] negligen[t]." Indeed, Lussier's own account of the stabbing supports the extreme-indifference-to-human-life element of his first-degree domestic abuse murder conviction. According to Lussier, while arguing with Sharlene and J.M., he picked up a knife to take his own life, and when they tried to stop him, he "lunged and pushed them away," and in the process stabbed Sharlene. Based on the record before us, we are satisfied that the postconviction court did not abuse its discretion when it found that there was sufficient evidence to support the extreme-indifference-to-human-life element of Lussier's conviction.

Because there is sufficient evidence of a past pattern of domestic abuse and sufficient evidence of an extreme indifference to human life, Lussier's claim fails on the merits. Because his claim fails on the merits, Lussier has failed to establish a "manifest injustice" entitling him to withdraw his guilty plea. *See* Minn. R.Crim. P. 15.05, subd. 1. Having concluded that Lussier's claim fails to establish a manifest

injustice entitling him to withdraw his guilty plea, we need not reach the remaining issues raised in this appeal.

Affirmed.

WRIGHT, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.