STATE OF MINNESOTA

IN SUPREME COURT

A15-1298

Chippewa County

Darek Jon Nelson,

Appellant,

vs.

State of Minnesota,

Respondent.

Lillehaug, J.
Took no part, Chutich, J.

Filed: June 22, 2016
Office of Appellate Courts

_____

Cathryn Middlebrook, Chief Appellate Public Defender, Chang Y. Lau, Assistant State Public Defender, Saint Paul, Minnesota, for appellant.

Lori Swanson, Attorney General, James B. Early, Assistant Attorney General, Saint Paul, Minnesota; and

David Gilbertson, Chippewa County Attorney, Montevideo, Minnesota, for respondent.
_____

S Y L L A B U S

The postconviction court properly denied appellant's petition for postconviction relief because he did not meet his burden to show that his guilty plea was not entered intelligently, accurately, or voluntarily.

Affirmed.

1

LILLEHAUG, Justice.

Darek Jon Nelson pleaded guilty to first-degree premeditated murder for the January 13, 2012, stabbing death of Vinessa Lozano. Nelson was sentenced to life in prison without the possibility of release. Nelson filed a petition for postconviction relief asking to withdraw his guilty plea. Following an evidentiary hearing, the postconviction court denied Nelson's petition, concluding that his plea was intelligently, accurately, and voluntarily entered. Because Nelson did not meet his burden to show otherwise, we affirm.

I.

*Factual Background*

On the evening of January 13, 2012, the Montevideo Police Department received a telephone call that a stabbing was occurring at the Pizza Ranch restaurant. As the first responding officer pulled into the Pizza Ranch parking lot, the victim was on the ground. Nelson was standing over her with a knife in his hand. Nelson looked toward the police car, bent over, and stabbed the victim. In response to the officer's instruction, Nelson dropped the knife, moved away from the victim, and submitted to arrest.

The victim, Vinessa Lozano, had been stabbed multiple times. She identified "Darek Nelson" as her attacker. She died shortly after arriving at the hospital.

An officer at the scene noted that Nelson's hands were covered in blood and his fingers were lacerated. After receiving medical treatment, Nelson was taken to the county jail, given a Miranda warning, and interviewed.

2

During the interview, Nelson explained that he and Lozano both worked at the Pizza Ranch. Nelson admitted that he had feelings for Lozano, but that they were "one sided." Five days before the stabbing, Nelson asked Lozano to come to his house. Lozano supposedly said she would stop by, but did not. This saddened Nelson. He began to think about stabbing her.

On Friday, January 13, Nelson brought a knife to work and hid it in his hoodie sweatshirt. Normally, on a cold night like that Friday, Nelson would have called his parents for a ride home when his shift ended. That night, though, he did not call; he "knew what was going to happen."

When Lozano left work, Nelson left, too, even though his shift had not ended. Wearing his hoodie, Nelson trailed Lozano a few steps. Nelson closed the gap and stabbed Lozano in the back. She collapsed on the ground and asked, "What are you doing?" Nelson continued to stab her—in the stomach, the chest, the neck, and on the cheek. As Lozano fought back, Nelson cut himself on his own knife.

Another employee, D.O., walked out of the Pizza Ranch, saw what was happening, and demanded that Nelson stop the attack. Nelson swung the knife at D.O. "[s]o that he would leave me alone and not interrupt things," and then went back to stabbing Lozano. The final stab was as the police arrived.

Nelson told officers that he had hoped Lozano would "go down quickly" because "then she wouldn't suffer much and maybe pass away quickly." Nelson explained that he knew that by stabbing Lozano he would go to jail "[p]robably [for] life or death maybe.

3

Or maybe 30 to 50 years." When told that Lozano had died, Nelson responded, "I figured she probably would, because I was pretty brutal."

Nelson was charged by complaint with second-degree intentional murder, first-degree manslaughter, and two counts of second-degree assault. At defense counsel's request, the district court ordered that Nelson undergo an examination under Minn. R. Crim. P. 20.01 to determine whether he was competent to participate in his case and whether he posed an imminent risk of serious danger.

The State Operated Forensic Services conducted the examination and diagnosed Nelson for the first time with Asperger's Disorder. However, Nelson was deemed to have the capacity to consult with his attorney. The examiner found that Nelson was naïve about the criminal justice system, having "absolutely no experience." The examiner concluded that "Nelson [would] need quite a bit of assistance from his attorney, perhaps more than the average defendant. His degree of naivety coupled with his characterological avoidance, passivity, and lack of interpersonal skills, will require a more active role on the part of his lawyer."

On May 16, 2012, Nelson was indicted for first-degree premeditated murder, second-degree intentional murder, and one count of second-degree assault with a dangerous weapon. Nelson's trial attorney moved the district court to order Rule 20.01 and Rule 20.02 examinations.[1] The district court granted the motion.

---

[1] A Rule 20.02 examination is used to determine whether a defendant may establish a mental-illness defense. *See* Minn. R. Crim. P. 20.02.

The second examiner opined that Nelson suffered from Asperger's Disorder, had never received mental health treatment, and was severely socially impaired. As a result of his mental illness, Nelson was "vulnerable to interpersonal rejection." Although the examiner concluded that Nelson did not meet the criteria for a mental-illness defense, *see* Minn. Stat. § 611.026 (2014), he believed the offense would not have occurred but for the Asperger's Disorder. The examiner also suggested that the disorder could be a mitigating circumstance in Nelson's case.

On October 30, 2012, Nelson filed a signed petition with the court, *see* Minn. R. Crim. P. 15, offering to plead guilty to second-degree intentional murder and second-degree assault and to be sentenced to consecutive sentences totaling 388 months. The State opposed the proposed plea, and the district court did not accept it.

*Plea Hearing*

On January 18, 2013, Nelson entered a guilty plea to first-degree premeditated murder in exchange for the State agreeing to dismiss the remaining charges against him. During the plea hearing, Nelson admitted that he brought a knife to work on the day of the murder. He testified that he began contemplating bringing the knife to work 5 days earlier. Nelson explained that Lozano had hurt his feelings, and that, if their issues were not verbally resolved on that Friday, he planned to stab her. Nelson admitted he left work around the same time as Lozano to follow her outside, even though his shift was not yet over. Nelson then admitted that he stabbed Lozano, causing her to fall to the ground, and that he continued to stab her.

5

When the district court asked Nelson whether he believed Lozano was going to die from the stab wounds, Nelson stated, "I wasn't sure," and noted that "it's not something that I've done before." Nelson added, "[i]t looked serious but I'm not a doctor." When asked about whether it was his intention to kill Lozano when he stabbed her, Nelson responded, "I think it was . . . just to get her hurt and then . . . to eat with her but it . . . went too far." When asked if it was his plan to stab Lozano when he began thinking about bringing the knife to work, he told the court that he had "just lashed out irrationally" and that the incident "just happened."

The following exchange occurred soon thereafter:

THE COURT: And what did you do after the police officer drove up?

NELSON: I think she got stabbed at least one more time.

THE COURT: You stabbed her even one more time after that?

NELSON: I believe so.

THE COURT: And was that to finish the job?

NELSON: More of a sigh of relief that it's done.

THE COURT: That it's done? In other words, that she's dead?

NELSON: No, that the incident is done.

The district court then asked the prosecutor and Nelson's attorney to approach for a bench conference. The court voiced concern, stating, "Kind of shaky ground here, guys." The court stated, "[I]t's not a good factual basis unless he knows he was killing her and he kept at it."

Nelson's attorney then offered to take Nelson into a private room to "visit with him." The prosecutor suggested that Nelson needed to "say he intended to kill [Lozano]" and that "after he was told she was dead, he wasn't surprised and it was pretty brutal and that she would die." Nelson's attorney agreed, stating, "Yeah," and took Nelson to the jury room to speak with him privately.

When Nelson finished speaking with his attorney, the district court resumed the bench conference. The court, defense counsel, and the prosecutor further discussed what was needed for an adequate factual basis. Nelson's attorney told the court and the prosecutor that Nelson "doesn't like to talk about all the gore." The district court assured defense counsel that Nelson did not need to discuss that, but "just tell me he intended to kill her." Nelson's attorney then suggested questions that the court could pose to Nelson, to which the prosecutor and the district court agreed. The bench conference ended.

The court and Nelson then had the following exchange:

THE COURT: Mr. Nelson, at some time during this event, I understand that [D.O.] came outside, is that correct?

NELSON: Yes.

THE COURT: And what did you do?

NELSON: I saw him and shooed him away.

THE COURT: You chased him away?

NELSON: Yes.

THE COURT: All right, and then did you go back after that to continue what you were doing?

NELSON: Yes.

7

THE COURT: In other words, to continue stabbing Vinessa, is that right?

NELSON: Yes.

THE COURT: And is it true that at one point she grabbed the knife to try to stop you?

NELSON: Well, that was before [D.O.] appeared.

THE COURT: Before [D.O.] appeared she grabbed the --

NELSON: Yes.

THE COURT: -- knife to try and --

NELSON: Yes.

THE COURT: All right, and did you pull the knife back away from her and keep stabbing her?

NELSON: Yes.

THE COURT: And by doing that, isn't it -- you intended to kill her?

NELSON: Yes.

The court then found that the factual basis was sufficient and accepted Nelson's guilty plea to first-degree premeditated murder. Nelson was sentenced to life in prison without the possibility of release. *See* Minn. Stat. §§ 609.106, subd. 2; 609.185(a)(1) (2014).

*Postconviction Proceedings*

Nearly 2 years later, Nelson filed a petition for postconviction relief, seeking to withdraw his guilty plea as not voluntarily or accurately entered. At the postconviction evidentiary hearing, Nelson was allowed to amend his petition to include the additional claim that his plea was not intelligently entered.

8

Nelson did not testify at the postconviction evidentiary hearing, but instead relied on the affidavit he submitted to the postconviction court as part of his petition for relief. In the affidavit, Nelson claimed that his attorney said that he was being "wishy-washy" about his answers. Nelson responded "that if I truly intended to kill [Lozano], I would have brought a gun with me on the night of the incident." Nelson also recalled that his attorney told him that "in order for things to move forward, [Nelson] would have to answer 'yes' to all of Judge Knutsen's questions."

Nelson's attorney for the plea was the sole testifying witness. He testified that several days before the plea hearing, Nelson stated that he wished to plead guilty to first-degree premeditated murder. The attorney discussed with Nelson the plea petition and the rights Nelson was waiving by pleading guilty. Nelson signed the plea petition.

Nelson's attorney recalled the bench conference that occurred during the plea hearing and that he and Nelson went to a private room to discuss the plea. The attorney "advised [Nelson] that the Court first of all, would not be able to take a plea were [Nelson] not to admit the facts that would support the plea and that it was up to [Nelson] whether he wanted to tell the judge the necessary facts or not." The attorney testified that he explained to Nelson the procedure to enter a guilty plea and that "the judge [was] not allowed to take a plea of guilty from someone who fails to acknowledge that they did what they're accused of doing . . . ." The attorney did not recall specifically discussing Nelson's responses with him. He recalled that Nelson said "he wanted to go forward." The attorney also recalled that he "probably told [Nelson] that he would need to speak up and he would need to clearly answer the questions." The attorney "categorically" denied

9

telling Nelson what to say. He also testified, "I'm not aware of anyone coercing [Nelson] in any way to enter a plea."

The postconviction court denied Nelson's petition for postconviction relief. The court held that Nelson's plea was intelligently entered because: (1) Nelson was told of the consequences of his plea; (2) during the plea hearing, he testified that he had spoken to his attorney and understood the rights he was waiving by pleading guilty; (3) defense counsel advised Nelson that it was up to him whether or not to admit to the factual basis for the plea; and (4) it was Nelson's "conscious decision to continue to plead guilty."

The postconviction court held that Nelson's plea was accurately entered because Nelson expressly admitted during the plea hearing that he intended to kill Lozano, and, taken together with the other facts Nelson admitted during the plea hearing, the elements of intent and premeditation were satisfied. From the court's perspective, Nelson did not claim a lack of intent to kill or a lack of premeditation, but "was simply reticent and reluctant to acknowledge his conduct." Finally, the postconviction court held that Nelson's plea was voluntary because it was not the product of improper pressure from his attorney.

II.

"We review a postconviction court's factual determinations under a clearly erroneous standard, and do not reverse those determinations unless they are not factually supported by the record." *Riley v. State*, 819 N.W.2d 162, 167 (Minn. 2012). But, "[a]ssessing the validity of a plea presents a question of law that we review de novo." *State v. Raleigh*, 778 N.W.2d 90, 94 (Minn. 2010). "To be constitutionally valid, a guilty

10

plea must be accurate, voluntary, and intelligent." *Id.* "A defendant bears the burden of showing his plea was invalid." *Id.* At the postconviction evidentiary hearing, the petitioner must "establish the facts by a fair preponderance of the evidence." Minn. Stat. § 590.04, subd. 3 (2014). We will address each argument in the order raised by appellant.

## A.

Nelson first contends that his plea was not intelligently entered. "The intelligence requirement ensures that a defendant understands the charges against him, the rights he is waiving, and the consequences of his plea." *Raleigh*, 778 N.W.2d at 96.

Here, Nelson's plea was intelligently entered. True, Nelson did not receive much, if any, tangible benefit by pleading guilty to an offense for which he would be sentenced to life in prison without the possibility of release. But the proper legal inquiry is whether, when he pleaded guilty, Nelson understood the charges against him, the rights he waived, and the consequences of the plea.

During the plea hearing, Nelson said that he understood the charges against him and the consequences of his plea. Twice the district court asked Nelson if he understood that the consequence of his guilty plea would be a sentence of life in prison without the possibility of release. Nelson responded affirmatively both times. Again, a third time, the district court asked Nelson if he understood that "the maximum penalty and actually the penalty for the crime that you're pleading guilty to is life imprisonment without [the] possibility of release." Nelson responded, "Yes."

11

Nelson further stated that he did not believe that he had any doubts about his ability to understand the proceedings and that counsel was knowledgeable about the facts of his case. He specifically said that his Asperger's Disorder did not prevent him from understanding his attorney's advice and the court proceedings.

Nelson's intelligent waiver of his rights is also apparent from the record. Nelson confirmed that he had received a copy of the plea agreement a few days prior to the hearing and had read and signed it. Nelson also confirmed that he understood that the plea agreement explained the legal rights he was waiving, including his right to have a trial by either a judge or a jury of 12 people. Nelson agreed that, by signing the plea agreement, he was acknowledging in writing to the court that his attorney had advised him of his rights and that he was "waiving and giving them up." The district court also carefully explained Nelson's trial rights, and Nelson said that he understood that he would be waiving them by pleading guilty.

In other words, the record clearly shows that Nelson understood the charges against him, understood the rights he was waiving, and understood the consequences of his plea. Therefore, he intelligently pleaded guilty to the first-degree premeditated murder of Lozano.

Nelson argues that his plea was not intelligent for two reasons. First, he contends that the district court and defense counsel failed to ensure that his conduct supported a plea of guilty after he made statements negating essential elements of the charged offense. This contention does not go directly to the intelligence of the plea, but to its accuracy, and will be discussed below.

12

Second, Nelson contends that during the plea hearing he should have been informed that he had the right to terminate the hearing and proceed with a jury trial. Nelson cites *State ex rel. Dehning v. Rigg*, 251 Minn. 120, 122, 86 N.W.2d 723, 725 (1957), in which we held that, when an issue arises during a plea hearing on whether an element of an offense can be met, the court should ensure that the defendant may consult with counsel and opt to proceed to trial.

Here, the district court did just that; it gave Nelson and his counsel an opportunity to confer. They did so. Unlike *Dehning*, in which defense counsel met with his client for the first time about 10 minutes before the plea hearing, 251 Minn. at 121, 86 N.W.2d at 725, Nelson had the same attorney for about a year before his plea, and he had met with the attorney repeatedly. Nelson's attorney had discussed Nelson's legal rights with him and testified during the evidentiary hearing that Nelson understood the consequences of his decision to plead guilty. Unlike *Dehning*, in which defense counsel advised his client to plead guilty, *id.* at 121, 86 N.W.2d at 725, here Nelson's attorney testified that, during the conference, he did not direct or encourage Nelson to plead guilty, but that Nelson made his own decision. Nelson did not rebut his attorney's testimony, as Nelson chose not to testify.

## B.

A plea must be accurate to ensure that a defendant does not "plead[] guilty to a more serious offense than that for which he could be convicted if he insisted on his right to trial." *Raleigh*, 778 N.W2d at 94. "To be accurate, a plea must be established on a proper factual basis." *Id.*; *Lussier v. State*, 821 N.W.2d 581, 588 (Minn. 2012). "The

13

factual-basis requirement is satisfied if the record contains a showing that there is credible evidence available which would support a jury verdict that defendant is guilty of at least as great a crime as that to which he pled guilty." *State v. Genereux*, 272 N.W.2d 33, 34 (Minn. 1978). However, "[t]he factual basis of a plea is inadequate when the defendant makes statements that negate an essential element of the charged crime because such statements are inconsistent with a plea of guilty." *State v. Iverson*, 664 N.W.2d 346, 350 (Minn. 2003).

"The district court typically satisfies the factual basis requirement by asking the defendant to express in his own words what happened." *Raleigh*, 778 N.W.2d at 94. We have "cautioned against the use of exclusively leading questions to establish a proper factual basis for a guilty plea." *Lussier*, 821 N.W.2d at 589. Nevertheless, "a defendant may not withdraw his plea simply because the court failed to elicit proper responses if the record contains sufficient evidence to support the conviction." *Raleigh*, 778 N.W.2d at 94.

Nelson challenges the accuracy of his plea on three grounds.[2] First, he argues that after he made statements during the plea colloquy that negated the elements of intent and

---

[2]     Nelson's argument that the district court erred by relying on evidence that was not introduced into the record during the plea hearing has been forfeited. Nelson fails to specify the evidence upon which the postconviction court should not have relied when concluding that Nelson's plea was accurate. We have said,

> General allegations of error, without detailing specific factual or legal errors, do not aid our review of the lower court's proceedings and consequently, almost never aid an appellant's cause. Therefore, we will not

(Footnote continued on next page.)

premeditation, the district court failed to properly rehabilitate the plea. Second, Nelson argues that the plea was inaccurate because the district court used leading questions to elicit the necessary admissions. Third, Nelson argues that the postconviction court used the wrong legal standard when it determined that there was a sufficient factual basis for the guilty plea. Specifically, the postconviction court stated that there was a "reasonable inference" that Nelson intended and premeditated the killing of Lozano. Nelson argues that the appropriate standard is "whether the facts in the record and the legitimate inferences drawn from them would permit the jury to reasonably conclude that the defendant was guilty beyond a reasonable doubt of the offense of which he was convicted." *State v. Al-Naseer*, 788 N.W.2d 469, 473 (Minn. 2010) (quoting *State v. Moore*, 481 N.W.2d 355, 360 (Minn. 1992)) (internal quotation marks omitted). We consider these arguments in turn.

Intent within the meaning of Minn. Stat. § 609.185(a)(1) "means that the actor either has a purpose to do the thing or cause the result specified or believes that the act, if successful, will cause that result." Minn. Stat. § 609.02, subd. 9(4) (2014). Intent "is generally proved by inferences drawn from a person's words or actions in light of all the surrounding circumstances." *State v. Thompson*, 544 N.W.2d 8, 11 (Minn. 1996). "Intent can be inferred . . . from the idea that a person intends the natural consequences of

---

(Footnote continued from previous page.)
consider any claim lacking supporting argument or authority unless prejudicial error appears obvious upon inspection of the record.

*State v. Bowles*, 530 N.W.2d 521, 525 n.1 (Minn. 1995). Because no such error is obvious here, we will not consider this claim.

his or her actions." *Stiles v. State*, 664 N.W.2d 315, 320 (Minn. 2003). "Intent to cause . . . death [can] be inferred from the nature and extent of the [victim's] wounds" and the defendant's failure to aid the victim after an assault. *State v. Raymond*, 440 N.W.2d 425, 426 (Minn. 1989). Premeditation "means to consider, plan or prepare for, or determine to commit, the act referred to prior to its commission." Minn. Stat. § 609.18 (2014).

In this case, the facts supporting Nelson's intent and premeditation overlap. The facts include Nelson's hurt feelings and resulting thoughts about stabbing Lozano; his decision to bring a knife to work; his plan to stab Lozano "if there wasn't a proper verbal agreement"; his act of following her to stab her in the back; and that he continued to stab Lozano even after she asked what Nelson was doing, after Nelson was cut, after D.O. tried to intervene, and even as the police arrived. Nelson clearly intended and planned to kill Lozano.

We next consider Nelson's argument that the district court should not have asked leading questions.[3] It is true that we have repeatedly discouraged the use of leading questions to establish a factual basis. *Raleigh*, 778 N.W.2d at 94-95; *State v. Ecker*, 524 N.W.2d 712, 717 (Minn. 1994); *Shorter v. State*, 511 N.W.2d 743, 744-45, 747 (Minn. 1994); *State v. Hoaglund*, 307 Minn. 322, 326, 240 N.W.2d 4, 6 (1976); *see State v. Trott*, 338 N.W.2d 248, 251 (Minn. 1983). However, we have never held that the use

---

[3]     A "leading question" is defined as "[a] question that suggests the answer to the person being interrogated; esp., a question that may be answered by a mere 'yes' or 'no.' " *Black's Law Dictionary* 1023 (10th ed. 2014).

of leading questions automatically invalidates a guilty plea, and we decline to do so in this case.

Here, the district court started questioning Nelson about the incident using open-ended questions. The court then began posing questions that could be answered with yes or no responses. But only a few of the questions were leading. On this record, there was a solid factual basis for the plea. *See Raleigh*, 778 N.W. 2d at 96 (explaining that "the factual basis for [defendant's] plea [was] sufficient, despite its disfavored format").

Third, we consider whether the postconviction court used the correct legal standard when it determined that there was a sufficient basis for the guilty plea. Our standard is clear: "It is well established that before a plea of guilty can be accepted, the trial judge must make certain that facts exist from which the defendant's guilt of the crime charged can be reasonably inferred." *State v. Neumann*, 262 N.W.2d 426, 430 (Minn. 1978), *abrogated on other grounds by Moore*, 481 N.W.2d at 360-61.

Here, the postconviction court applied the correct legal standard when it concluded that the evidence gave rise to a reasonable inference that Nelson intended and premeditated Lozano's killing. Based on the record, there is adequate support for the first-degree premeditated murder conviction.

C.

Finally, we consider Nelson's pro se argument that his plea was involuntary. "To determine whether a plea is voluntary, the court examines what the parties reasonably understood to be the terms of the plea agreement." *Raleigh*, 778 N.W.2d at 96. "The voluntariness requirement ensures a defendant is not pleading guilty due to improper

17

pressure or coercion." *Id.* "Whether a plea is voluntary is determined by considering all relevant circumstances." *Id.*

In his pro se brief, Nelson asserts that his plea was involuntary because he was naïve and felt pressured to sign the plea agreement. In his affidavit to the postconviction court, Nelson asserted that, during the private discussion he had with his attorney, he was told to answer "yes" to all of the district court's questions at the plea hearing. But Nelson chose not to testify at the evidentiary hearing. And the postconviction court was persuaded by the uncontested testimony of Nelson's attorney that Nelson had a choice and was not coerced.

Further evidence of voluntariness is that, after returning to the plea hearing, Nelson did not respond "yes" to every question asked by the district court. Nelson also denied that he had been subjected to threats or promises. At no time did Nelson give any indication whatsoever that his plea was involuntary. The record shows to the contrary.

Because Nelson failed to show that his guilty plea was not intelligent, accurate, or voluntary, the postconviction court properly denied the petition for postconviction relief.

Affirmed.


CHUTICH, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.