*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-0479**

State of Minnesota,
Respondent,

vs.

Keon Malone Mangun,
Appellant.

**Filed May 26, 2015
Affirmed
Reilly, Judge**

Morrison County District Court
File No. 49-CR-12-1616

Lori Swanson, Attorney General, James B. Early, Assistant Attorney General, St. Paul, Minnesota; and

Brian Middendorf, Morrison County Attorney, Little Falls, Minnesota (for respondent)

Landon J. Ascheman, Grant S. Smith, Ascheman & Smith, LLC, St. Paul, Minnesota (for appellant)

Considered and decided by Reilly, Presiding Judge; Ross, Judge; and Kirk, Judge.

# U N P U B L I S H E D   O P I N I O N

**REILLY**, Judge

In this combined direct and postconviction appeal, appellant Keon Mangun challenges the district court's denial of his request for a new trial and postconviction relief. Because the evidence is sufficient to support the conviction and the district court did not abuse its discretion in denying the postconviction petition, we affirm.

# FACTS

On February 28, 2012, 19-year-old M.G. died of a drug overdose. The state charged appellant with third-degree murder and aiding and abetting third-degree murder, in violation of Minn. Stat. § 609.195(b) (2010), for selling the heroin that caused M.G.'s death. A jury found appellant guilty of the third-degree controlled-substance murder charge. The events leading up to M.G.'s death are the focus of this appeal.

Testimony from the October 28-30, 2013 jury trial established the following. On the morning of February 27, Tanya Ashby, Christian Dahn, and Brandon Bedford drove from Little Falls to the Twin Cities to find work. Ashby and Dahn were romantically involved and in the tree-trimming business together. Dahn lived with Ashby in the downstairs bedroom of Ashby's house. Bedford, an employee of the business, rented an upstairs bedroom in Ashby's house.

While in the Twin Cities, the three individuals went to north Minneapolis and purchased heroin from a man named "Bird." "Bird" was later identified as appellant. Dahn estimated that he bought one and one-half grams of heroin from appellant, and that Bedford bought half a gram of heroin. All three individuals snorted heroin during the drive back to Little Falls.

During the afternoon of February 27, M.G. was at her sister's house and left around 4:00 p.m. to go home and make her father dinner. M.G. was at her father's house until around 8:00 p.m., when she received an invitation to Ashby's house. When M.G. arrived at Ashby's house, M.G. appeared sober and looked healthy. After M.G. arrived, Bedford prepared three lines of heroin. Ashby snorted one line, and Bedford snorted one

line and offered the third line to M.G. Ashby did not actually witness M.G. snort the line of heroin and went to bed immediately after snorting her line. Before Ashby left the room, M.G. told her "[d]on't be mad at me." M.G. had previously admitted to relapsing in a text message she sent to Ashby that day.[1]

Sometime before midnight, M.G. left Ashby's house and went to W.B.'s house. W.B. testified that when M.G. arrived, she looked "[m]essed up," and that "[h]er eyes were barely open. She couldn't concentrate." W.B. was aware of M.G.'s drug problems and thought she looked high. While M.G. was at W.B.'s house, W.B. asked M.G. for a painkiller. W.B. claimed M.G. had sought painkillers from him after she left treatment, but that he never gave her any pills. M.G. stayed at W.B.'s house for approximately 15-20 minutes. W.B. denied doing any drugs with M.G. during the time she was at his house. W.B. testified that M.G. came over to pick up her Narcotics Anonymous tags that she had left at his house.

On the morning of February 28, Dahn and Ashby used heroin immediately after waking up. Neither Ashby nor Dahn saw M.G. until that morning, when she came downstairs to use the restroom. When Dahn saw M.G., he did not think she looked intoxicated. Ashby also thought that M.G. appeared happy and did not appear high or intoxicated the morning of February 28. After briefly talking with M.G., Ashby left to run errands and returned to her house before noon.

---

[1] In 2010, M.G. took prescription medications from her mother who was dying of cancer. After her mother passed away, M.G. started purchasing heroin in Little Falls. M.G. was later confronted about her drug use, and she agreed to get treatment. M.G. checked into a treatment center and remained there for 31 days, until checking out of the treatment center on February 1, 2012.

Upon returning, Ashby went upstairs to Bedford's room to retrieve her debit card that she had loaned him the previous evening. While in Bedford's room, Ashby saw Bedford and M.G. in Bedford's bed. They appeared to have recently woken up, and they did not look high. Around noon, Bedford came back downstairs and told Ashby that his mother was coming to the house. Ashby told Bedford to wake up M.G. so she could get ready. Shortly thereafter, Bedford started yelling for help. Ashby ran up to Bedford's room and saw M.G. lying on the bed. M.G. was not breathing, and Ashby began performing CPR on her. The police and paramedics arrived. Paramedics were unable to revive M.G. and pronounced her dead.

Sergeant Charles Strack questioned Ashby and searched her house shortly after M.G.'s death. Ashby testified that she was high during this questioning and had used heroin before she ran errands. Sergeant Strack found a brown powdered substance in Ashby's purse. Laboratory testing confirmed that the substance was heroin. Ashby testified that the heroin found in her purse was the heroin that she and Dahn bought the previous day in Minneapolis and that they had not bought any additional heroin since their Minneapolis purchase. Sergeant Strack also found morphine, OxyContin, Xanax, Lorazepam, and Percocet in Ashby's purse. Law enforcement collected three empty morphine bottles from Ashby's bedroom. Law enforcement also found burnt aluminum foil, cotton swabs, a glass smoking pipe, and lighters in Bedford's bedroom. Testimony established that aluminum foil can be used to burn heroin and inhale it.

Dr. Kelly Mills, a forensic pathologist and medical doctor, testified at the trial. Dr. Mills concluded that the cause of M.G.'s death was "[h]eroin toxicity." Dr.

4

Mills tested M.G.'s blood, urine, and vitreous fluid, which is the fluid around the eye, for drugs. Dr. Mills explained that blood and vitreous fluid testing reveals what was active in an individual's system at the time of death, while urine testing reveals what has been in an individual's system for a prolonged period. Drugs found in the urine are no longer "imparting any kind of pharmacological activity" upon an individual.

M.G.'s blood tested positive for morphine of a "significant toxic level," and her vitreous fluid tested positive for a chemical called 6-monacetylmorphine, a heroin metabolite. Dr. Mills explained that because heroin metabolizes very quickly and therefore does not appear on a toxicological screen, the presence of 6-monacetylmorphine is used to determine that an individual ingested heroin as opposed to morphine. If an individual ingests heroin, morphine and 6-monacetylmorphine would show up on a toxicological screen. Conversely, if an individual has ingested only morphine, 6-monacetylmorphine would not show up on a toxicological screen. Dr. Mills opined that, due to the 6-monacetylmorphine found in M.G.'s vitreous fluid, it was likely that the lethal dose of heroin was consumed on the morning of her death because the half-life of 6-monacetylmorphine is very short—between 6 to 30 minutes—indicating that M.G. consumed heroin shortly before she died. The presence of both morphine and 6-monacetylmorphine supported Dr. Mills's conclusion that the cause of M.G.'s death was a heroin overdose.

The jury found appellant guilty of third-degree controlled-substance murder.[2] Bedford did not testify at appellant's trial, and his whereabouts were unknown. He was arrested on December 2, 2013, on an outstanding warrant based on his failure to submit to drug testing and appear for court. Bedford was tried on charges of third-degree controlled-substance murder and third-degree controlled-substance crime in March 2014. A jury found him guilty only of third-degree controlled-substance crime.

On November 21, 2013, appellant moved for judgment of acquittal or a new trial. The district court denied appellant's motion in a December 16, 2013 order, finding the circumstantial evidence sufficient to support the verdict. The district court also rejected the contention that Bedford's act of giving heroin to M.G. was an intervening, superseding act and concluded that the jury instructions were not erroneous. On December 30, 2013, the district court sentenced appellant to the commissioner of corrections for 134 months and ordered restitution in the amount of $19,900.20.

On March 24, 2014, appellant filed a notice of appeal. Appellant then moved to stay the appeal so he could pursue postconviction relief due to newly discovered evidence. On June 10, 2014, appellant filed a petition for postconviction relief. Appellant argued that newly discovered evidence in the form of testimony from Bedford's trial entitled him to an evidentiary hearing and the vacation of his conviction. The district court summarily denied appellant's petition. This combined appeal follows.

---

[2] At the beginning of the third day of trial, the state successfully moved to dismiss the aiding and abetting third-degree controlled-substance murder charge.

## DECISION

### I.

Appellant first argues that the evidence was insufficient to convict him of third-degree controlled-substance murder. When considering a claim of insufficient evidence, we conduct "a painstaking analysis of the record to determine whether the evidence, when viewed in a light most favorable to the conviction," was sufficient to allow the jurors to reach the verdict that they reached. *State v. Caine*, 746 N.W.2d 339, 356 (Minn. 2008) (quotation omitted). We must assume that "the jury believed the State's witnesses and disbelieved the defense witnesses." *State v. Tscheu*, 758 N.W.2d 849, 858 (Minn. 2008). We will not disturb the verdict if the jury, acting with due regard for the presumption of innocence and the requirement of proof beyond a reasonable doubt, could reasonably conclude that the defendant was guilty of the crime charged. *Bernhardt v. State*, 684 N.W.2d 465, 476-77 (Minn. 2004).

This court applies an elevated, two-step process in reviewing a conviction based on circumstantial evidence. *State v. Nelson*, 812 N.W.2d 184, 188 (Minn. App. 2012). First, we identify the circumstances proved. *State v. Silvernail*, 831 N.W.2d 594, 598 (Minn. 2013). Second, we "examine independently the reasonableness of all inferences that might be drawn from the circumstances proved" to "determine whether the circumstances proved are consistent with guilt and inconsistent with any rational hypothesis except that of guilt, not simply whether the inferences that point to guilt are reasonable." *Id.* at 599 (quotations omitted).

Under this heightened standard, appellant argues that the evidence is insufficient to establish that appellant's heroin proximately caused M.G.'s death because (1) there is a reasonable inference that M.G. supplied her own heroin, or (2) M.G.'s death was not caused by heroin but, instead, caused by prescription morphine.

Under the first step of the heightened test, we must determine the circumstances proved. "In identifying the circumstances proved, we defer, consistent with our standard of review, to the jury's acceptance of the proof of these circumstances and rejection of evidence in the record that conflicted with the circumstances proved by the State." *State v. Al-Naseer*, 788 N.W.2d 469, 473 (Minn. 2010) (quotations omitted). This deference "is because the jury is in the best position to evaluate the credibility of the evidence even in cases based on circumstantial evidence." *Silvernail*, 831 N.W.2d at 599.

Through the evidence admitted at trial, the following circumstances were proved. On February 27, 2012, Ashby, Dahn, and Bedford purchased approximately two grams of heroin from appellant in north Minneapolis; Dahn bought one and one-half grams and Bedford bought a half gram. They did not make any other heroin purchases. During the drive back to Little Falls, all three individuals snorted some of the heroin. Around 8 p.m., M.G. arrived at Ashby's house, and she did not appear high or intoxicated. Bedford prepared three lines of heroin for himself, Ashby, and M.G. Ashby and Bedford each snorted a line. Before midnight on February 27, M.G. left Ashby's house and went to W.B.'s residence. While at W.B.'s residence, M.G. looked "[m]essed up," and W.B. asked M.G. for painkillers. M.G. did not give him painkillers and they did not use narcotics together.

Dahn and Ashby did not see M.G. again until the morning of February 28, when Ashby saw M.G. downstairs in her house. M.G. did not appear high or intoxicated. Sometime before noon, Ashby saw M.G. again when she went upstairs to Bedford's bedroom to retrieve her debit card. M.G. appeared to have just woken up and did not appear high or intoxicated. Later on, Bedford came downstairs and Ashby told Bedford to wake up M.G. so she could get ready. Shortly after going back upstairs, Bedford yelled for help. Ashby arrived upstairs and saw M.G. lying on the bed. M.G. was not breathing.

On February 28, 2012, M.G. died of a drug overdose due to "heroin toxicity." A blood test revealed morphine of a "significant toxic level." A vitreous fluid test revealed the presence of 6-monacetylmorphine, which is a heroin metabolite and only present for a very short time after a person uses heroin. The use of prescription morphine would not produce 6-monacetylmorphine. Prior to February 28, M.G. was a resident in a drug treatment program. M.G., though, relapsed shortly after leaving the program. M.G. previously used prescription pills and heroin, and she had purchased heroin in Little Falls on prior occasions.

Next, we must "determine whether the circumstances proved are consistent with guilt and inconsistent with any rational hypothesis except that of guilt." *Id.* at 599 (quotations omitted). The circumstances proved must be viewed not as isolated facts, but as a whole. *State v. Hurd*, 819 N.W.2d 591, 599 (Minn. 2012). A person is guilty of third-degree controlled-substance murder if the person, "without intent to cause death, proximately causes the death of a human being by, directly or indirectly, unlawfully

9

selling, giving away, bartering, delivering, exchanging, distributing, or administering a controlled substance classified in Schedule I or II." Minn. Stat. § 609.195(b). Heroin is a Schedule I controlled substance. Minn. Stat. § 152.02, subd. 2(2) (Supp. 2011). Appellant argues other rational hypotheses exist that are inconsistent with his guilt and thus support reversal of his conviction. We will address each in turn.

Appellant first claims that it is a rational or a reasonable possibility that M.G. supplied her own heroin and that it is impossible to determine whether the fatal heroin came from appellant. We disagree. In support of his argument, appellant points out that Dahn, Ashby, and Bedford only bought two bindles of heroin from appellant, but that the police found three bindles of heroin at Ashby's house. We can find no record support for this assertion. The record shows that Dahn bought one and one-half grams of heroin from appellant and that Bedford bought a half gram of heroin. There is nothing in the record that describes how much heroin was packaged in a bindle or how many bindles were purchased. The record, however, does contain evidence that the heroin in Ashby and Dahn's possession at the time of M.G.'s death came from appellant. And both Ashby and Dahn testified that no additional heroin was purchased after the February 27 buy.

Appellant also argues that the lack of physical evidence linking him to the heroin that killed M.G. and the fact that the jury did not need to disbelieve any of the state's witnesses to believe that M.G. procured her own heroin is enough to overturn the jury's verdict. There is no evidence in the record to support the assertion that M.G. bought her own heroin, other than the testimony from her sister that M.G. had previously purchased heroin in Little Falls. The only evidence in the record regarding M.G. procuring her own

10

drugs is W.B.'s testimony that she sought painkillers from him. And all heroin recovered by law enforcement was found in Ashby's purse or on her dresser. There is no evidence in the record that heroin, or remnants of heroin, were found on M.G. or in her belongings.

We conclude that the contention that M.G. supplied and overdosed on her own heroin is conjecture and not supported by the circumstances proved. *See State v. Andersen*, 784 N.W.2d 320, 330 (Minn. 2010) ("[W]e will not overturn a conviction based on circumstantial evidence on the basis of mere conjecture.").

Next, appellant argues that there is insufficient evidence to prove that M.G. died from a heroin overdose. Appellant primarily claims that it is possible that an overdose of prescription morphine caused M.G.'s death. Contrary to appellant's assertions, Dr. Mills explicitly testified that M.G. died from a heroin overdose:

> DEFENSE COUNSEL: There's nothing in your autopsy protocol that says heroin killed [M.G.], and it came from someone name Bird.
> DR. MILLS: It just says heroin killed her, not from whom she acquired it from, correct.
> DEFENSE COUNSEL: And you don't have anything that says it came from [appellant].
> DR. MILLS: No, I do not.
> DEFENSE COUNSEL: Your job is to determine the cause and circumstances of [M.G.'s] death.
> DR. MILLS: That would be correct, yes.
> DEFENSE COUNSEL: All right. So I would like to talk to you about each one of those. First, about the cause of death. The cause of death in this case was pulmonary and cerebral edema; is that right?
> DR. MILLS: Heroin toxicity, yes.
> DEFENSE COUNSEL: Well, the actual, the cause of the death, was respiratory suppression, essentially that she stopped breathing.
> DR. MILLS: That is actually the mechanism of death, and on the death certificates we put the cause, not a mechanism.

11

> DEFENSE COUNSEL: The – what you say caused the mechanism would be heroin toxicity.
> DR. MILLS: Correct.

Death caused by heroin toxicity is consistent with the jury's verdict and does not conflict with the circumstances proved by the state. And to accept appellant's argument that M.G. died of a prescription morphine overdose would require us to reject the jury's acceptance of proof. Because the jury found appellant guilty of third-degree controlled-substance murder, they accepted the state's evidence in the form of Dr. Mills's testimony that it was heroin that killed M.G. Viewing the circumstances proved, on the whole, they are consistent with guilt and inconsistent with any rational hypothesis of innocence.

## II.

Appellant argues that the "series of sales" required to transfer the heroin from appellant to M.G. was an intervening, superseding cause that broke the chain of causation. Specifically, appellant claims that because the subsequent transfer of heroin to M.G. was not reasonably foreseeable, this transfer is an intervening act relieving him of liability. We are not persuaded.

The third-degree controlled-substance murder statute contemplates liability under the current facts. The explicit language of Minn. Stat. § 609.195(b) attaches liability to an individual who "without intent to cause death, proximately causes the death of a human being by, directly or indirectly, unlawfully selling, . . . distributing, or administering a controlled substance." This court must interpret a statute "to give effect to all of its provisions, and no word, phrase, or sentence should be deemed superfluous, void, or insignificant." *State v. Larivee*, 656 N.W.2d 226, 229 (Minn. 2003) (quotations

12

omitted). And we have previously stated that the intent of the third-degree controlled-substance murder statute is to "punish commercial drug trafficking that results in the death of a drug user." *State v. Vasquez*, 776 N.W.2d 452, 459 (Minn. App. 2009). By accepting appellant's argument that he cannot be held liable for a death caused by a subsequent transfer of the heroin that he sold, we would have to read "indirectly" out of section 609.195(b). We therefore conclude that Minn. Stat. § 609.195(b) contemplates liability for subsequent transfers of narcotics from the immediate buyer to another drug user. To limit section 609.195(b) only to transfers between a seller and the immediate buyer would ignore the plain language of the statute. Thus, appellant's intervening, superseding cause argument does not relieve him of liability.

In sum, the circumstantial evidence is sufficient to support appellant's conviction of third-degree controlled-substance murder.

**III.**

Appellant argues that the district court abused its discretion when it denied appellant's postconviction petition without holding an evidentiary hearing.

This court reviews a summary denial of a postconviction petition for an abuse of discretion. *State v. Nicks*, 831 N.W.2d 493, 503 (Minn. 2013). "When reviewing a postconviction court's decision, we examine only whether the postconviction court's findings are supported by sufficient evidence." *Lussier v. State*, 821 N.W.2d 581, 588 (Minn. 2012) (quotation omitted). "The postconviction court must hold an evidentiary hearing '[u]nless the petition and the files and records of the proceeding conclusively

13

show that the petitioner is entitled to no relief.'" *Staunton v. State*, 842 N.W.2d 3, 6-7 (Minn. 2014) (citation in original) (quoting Minn. Stat. § 590.04, subd. 1 (2012)).

Appellant alleges that he is entitled to a new trial based on newly discovered evidence. In order to obtain relief based on new evidence, an appellant must allege facts that, if proven, would satisfy the following test:

> (1) that the evidence was not known to the defendant or his/her counsel at the time of the trial; (2) that the evidence could not have been discovered through due diligence; (3) that the evidence is not cumulative, impeaching, or doubtful; and (4) that the evidence would probably produce an acquittal or a more favorable result.

*Wright v. State*, 765 N.W.2d 85, 93-94 (Minn. 2009) (quoting *Rainer v. State*, 566 N.W.2d 692, 695 (Minn. 1997)).

Here, appellant's newly discovered evidence consists of testimony from Bedford at this trial that: (1) M.G. went downstairs multiple times on the day of her death; (2) Ashby gave Bedford Ativan to give to M.G.; and (3) on the morning of February 28, Bedford ingested all of his heroin. The postconviction court found that appellant could not satisfy the third and fourth prongs of the *Rainer* test because appellant's newly discovered evidence was "cumulative and doubtful." Accordingly, the postconviction court denied appellant's petition for postconviction relief and his request for an evidentiary hearing.

The first piece of proffered evidence is testimony from Bedford's trial regarding the number of times M.G. left his bed the morning of February 28:

> DEFENSE COUNSEL: Okay. So let's back up a little bit from that - that point where you used again the next morning

14

or afternoon, or whenever you got up. What do you recall happening that morning?

BEDFORD: I was - I slept in. I mean, that's what I kind of planned on doing all day, just sleeping in. It was a busy week. And I noticed that [M.G.] ha[d] gotten up and left a couple of times I think is when - I mean, when you leave the bed and you just feel the bed shake and my eyes just opened for a second, and then she'd go downstairs.

Appellant claims that this testimony is not cumulative because, while the jury knew that M.G. left Ashby's house the night before her death, they did not know that she left Bedford's bed multiple times on the morning of her death. Aside from establishing that M.G. left Bedford's bed a "couple of times," this testimony is cumulative because the jury already knew that M.G. had left Bedford's bed once the morning of February 28. Moreover, this testimony would not produce a more favorable result as the jury already knew that M.G. had at least one opportunity to obtain other drugs from around the house. The guilty verdict confirms that the jury rejected this possibility.

Second, appellant argues that evidence of Bedford's denial of giving M.G. narcotics and of Ashby giving him Ativan supports the conclusion that M.G. died of a prescription morphine overdose. Appellant claims that this testimony shows that the residents of the house regularly exchanged drugs, and that Ashby may have mixed up an Ativan with prescription morphine. Bedford testified to the following:

DEFENSE COUNSEL: Did you ever give [M.G.] any - aside from the use the night of the 27th, did you give her any subsequent illegal narcotics or heroin after that use, the night of the 27th  into the morning of the 28th?

BEDFORD: No, I did not. That - well, that morning [Ashby] came up to me and wanted me to give her a couple of - I believe they were called – it's something for the – they'll – to kind of relax you a little bit. I knew the name just a little bit

15

ago but - Ativan. It was Ativan. She gave me a couple of them and said, "Make sure you give these couple - couple of these to her when she wakes up because she will be a little shaky."

PROSECUTOR: Objection. Hearsay. Ask that the answer be stricken.

THE COURT: I'm going to overrule it. Go ahead.

DEFENSE COUNSEL: Now, that information wasn't in your statement to the interview with the law enforcement officers.

BEDFORD: I did forget to mention that.

DEFENSE COUNSEL: That's kind of an important piece of information, don't you think?

BEDFORD: It is, yes. I was - when I was giving the statement, I was still in shock at the time, so - but that was the only piece of information that I kind of forgot to leave out.

Appellant argues that this testimony is not cumulative because the jury did not know about this specific drug transaction. Although the jury did not know about the transaction involving Ativan, we fail to see how this evidence relating to the Ativan would produce a more favorable result as the record shows that Bedford never testified that he actually gave the Ativan to M.G. Even assuming that Bedford gave M.G. Ativan, this exchange is too tenuous to conclude that M.G. died of a morphine overdose due to a mix-up between Ativan and prescription morphine, especially in light of the forensic pathologist's testimony that M.G. died of a heroin overdose.

Moreover, the district court found this evidence "doubtful" and "clearly self-serving, as he was trying to avoid a third-degree murder conviction." Our review of the exhibits submitted in support of appellant's postconviction petition confirms this finding. Among other exhibits, appellant submitted Bedford's March 2014 trial testimony and a transcribed February 2012 interview with law enforcement. Although both exhibits do offer additional information as to the February 28 events, neither creates material facts

16

that warrant an evidentiary hearing. *See Vance v. State*, 752 N.W.2d 509, 512-13 (Minn. 2008) ("A postconviction court is required to hold an evidentiary hearing only when there are disputed material facts that must be resolved to determine the merits of the postconviction claims.").

Appellant argues that the following testimony is not cumulative and would result in a more favorable outcome:

> DEFENSE COUNSEL: Did you use at any point after that next morning, the 28th?
> BEDFORD: The 28th I did, yes.
> DEFENSE COUNSEL: What time was that?
> BEDFORD: It was in the morning when I - or, say, in the afternoon. I thought it was the morning, but when I got up, I was going to give [Ashby] some. I was going to sell her some, and she actually didn't take it but - because I needed some money, so she gave me some money but I just ended up doing it.

Appellant claims that this evidence shows that Bedford used all of his heroin and therefore had none to give to M.G. Although this evidence is not cumulative, it does not establish that Bedford snorted all of his heroin and left none for M.G. Rather, this testimony merely establishes that Bedford was going to sell Ashby "some" heroin but, instead, ingested the heroin himself. Accordingly, this testimony would not produce a more favorable result.

Lastly, appellant contends that the postconviction court erred when it disbelieved Bedford's testimony by presuming jury nullification. In his postconviction petition, appellant argued that Bedford's acquittal shows that the jury did not believe that Bedford gave M.G. the fatal dose of heroin. It is clear from the postconviction court's

17

memorandum that the court referenced jury nullification when it addressed appellant's argument that "Bedford's acquittal shows that the jury believed Bedford did not give [M.G.] the heroin that killed her." Moreover, the postconviction court did not presume jury nullification when it declined to accept Bedford's testimony at face value. Rather, the postconviction court's concerns surrounding Bedford's testimony stemmed from significant credibility issues it personally observed.

Because sufficient evidence exits to sustain the postconviction court's findings, it did not abuse its discretion when it summarily denied appellant's postconviction petition.

**Affirmed.**