## STATE v. GREGORY GEORGE MARSHALL KNOX.

250 N. W. 2d 147.

December 23, 1976—No. 45854.

---

*C. Paul Jones,* State Public Defender, and *Mollie G. Raskind,* Assistant State Public Defender, for appellant.

*Warren Spannaus,* Attorney General, *Richard G. Mark,* Assistant Attorney General, *Gary Hansen,* Special Assistant Attorney General, and *William M. Gustafson,* County Attorney, for respondent.

Considered and decided by the court en banc.

SHERAN, CHIEF JUSTICE.

Defendant appeals from a judgment of conviction entered against him on November 13, 1974, in the Nicollet County District Court, adjudging him guilty of violation of Minn. St. 609.485 (escape).

We affirm.

The facts of this case may be simply stated. In 1967, defendant was convicted upon his plea of guilty of the crime of attempted aggravated robbery. He was sentenced to 0-10 years, and incarcerated at the state prison. On July 27, 1971, defendant was committed as mentally ill and dangerous to the Minnesota Security Hospital (MSH) at St. Peter, by the Washington County Probate Court.

Upon defendant's arrival at MSH, he was diagnosed as psychotic and delusional. A course of treatment was determined, which included the administration of antipsychotic drugs. This treatment continued through February 1973, when the antipsychotic drugs ceased to be administered. During this period, his delusions became less frequent and finally disappeared.

Defendant was granted a "medical parole" to MSH on January 15, 1973, by the Minnesota Corrections Authority. Prior to that time, his confinement at MSH was based solely upon the order of civil commitment.

On June 11, 1973, it was discovered that defendant and another patient, Merle Campbell, had escaped. Egress from the hospital had apparently been gained by cutting through one of the bars on the window in defendant's room, crossing a courtyard, cutting through a wire gate, and climbing over two more fences. No one authorized defendant to leave MSH premises. He was taken into custody on October 13, 1973, in Orlando, Florida on charges of vagrancy and he was returned to MSH on October 30, 1973.

In May 1974, defendant was recommended for discharge from his civil commitment; the discharge became effective on May 30, 1974.

On May 14, 1974, the criminal complaint charging defendant with escape was executed by the medical director of MSH, Dr. Charles Sheppard. It was issued the same day. Defendant's case came on for trial on October 29, 1974. He waived his right to a jury trial, and the case was tried to the court. The court found defendant guilty, and he appealed.

Several issues are raised by defendant on appeal. They are:

(1) Does Minn. St. 609.485 apply to the facts of this case, and, if so, is such an application constitutional?

(2) Was sufficient competent evidence introduced at trial to support the trial court's findings?

(3) Was defendant denied the assistance of counsel at a critical stage of the proceedings against him?

(4) Was defendant denied his right to a speedy trial?

1. *Applicability and Validity of Minn. St. 609.485.*

Defendant was convicted of violating Minn. St. 609.485, subd. 2(1). That statutory section provides, in pertinent part:

"Subdivision 1. 'Escape' includes departure without lawful authority and failure to return to custody following temporary leave granted for a specific purpose or limited period.

"Subd. 2. Whoever does any of the following may be sentenced as provided in subdivision 4:

"(1) Escapes while held in lawful custody on a charge or conviction of a crime;

\* \* \* \* \*

"Subd. 3. This section does not apply to a person who is free on bail or who is on parole or probation, or subject to a stayed sentence or stayed execution of sentence, unless he has been taken into actual custody upon revocation of the parole, probation, or stay of the sentence or execution of sentence."

On appeal, defendant asserts that (a) his conduct does not fall within the proscription of the statute in fact; or (b) the parole exception of Minn. St. 609.485, subd. 3, applies; or, finally, in the alternative, (c) if the statute is applicable, such an application constitutes a denial of equal protection of the law.

(a) Applicability in Fact.

Central to defendant's claim that his conduct was not proscribed by Minn. St. 609.485 is the contention that he was held under civil commitment and not under "a charge or conviction of a crime." Defendant points out that the Advisory Committee

Comment to the statute states, "The proposed act does not include escapes from custody of a person held in a non-criminal proceeding, such as escapes from mental hospitals." 40 M. S. A. p. 430 (1964). From this statement, it is argued, the intent of the legislature can be discerned to specifically exclude escapes such as the instant one from the operation of the statute. The defect in this reasoning is that the Comment seems to contemplate conduct of persons held *only* in noncriminal proceedings, and may be read much more narrowly than defendant urges. Secondly, while the Advisory Committee Comment can be viewed as indicative of legislative intent, such intent must also be discerned from the factual context in which the statute is to be applied, the object of the statute, and the context of other pertinent statutory provisions. Minn. St. 645.16.

Minn. St. 253.21 provides the authority under which defendant was transferred to MSH. That section provides:

"When any person confined in the state prison or the state reformatory is alleged to be insane, the warden or other person in charge shall forthwith notify the commissioner of public welfare, who shall cause the prisoner to be examined by the probate court of the county where he is confined, as in the case of other insane persons. In case he is found to be insane, he shall be transferred by the order of the court to the Minnesota Security Hospital or to a state hospital for the insane in the discretion of the court, there to be kept and maintained as in the case of other insane persons. If, in the judgment of the superintendent, his sanity is restored before the period of his commitment to the penal institution has expired, he shall be removed by the commissioner, upon the certificate of the superintendent, to the institution whence he came, and there complete the period of his sentence."

Other pertinent sections of c. 253 provide:

253.23   "When any criminal shall be transferred to the Minnesota Security Hospital the original warrant of his commit-

ment to the penal institution shall be sent with him and returned to the penal institution upon his return or discharge. A certified copy thereof shall be preserved at the penal institution."

253.24 "A prisoner who is removed or returned under sections 253.20 to 253.27 shall be held in the place to which he is so removed or returned in accordance with the terms of his original sentence unless sooner discharged and the period for which he is removed shall be counted as a part of the term of the confinement."

253.13 "When a state prison or reformatory convict who has been committed to a state hospital escapes therefrom or dies therein, the superintendent shall immediately notify the chief executive officer of such prison or reformatory of such fact."

Read together, these provisions appear to rebut defendant's contention, and seem to indicate a legislative intent to treat prisoners who are transferred to MSH as being under the continuing custody of the state prison. The concept that a person who has been both civilly committed and sentenced to a term of imprisonment might be in the custody of both the Department of Public Welfare and the commissioner of corrections has been expressly embraced by this court in the recent case of Lausche v. Commissioner of Public Welfare, 302 Minn. 65, 225 N. W. 2d 366 (1974), certiorari denied, 420 U. S. 993, 95 S. Ct. 1430, 43 L. ed. 2d 674 (1975). While that case dealt with a civil commitment which occurred prior to the criminal conviction and incarceration, this fact would not seem to distinguish the conclusion that—

"* * * the appellant is under commitment to both the commissioner of public welfare and the commissioner of corrections. The commissioner of public welfare has the express statutory authority to transfer patients to a 'suitable' institution without disturbing a commitment. Minn. St. 246.14. * * * Since both proceedings are in accordance with due process of law, one com-

mitment does not disturb the other." 302 Minn. 65, 71, 225 N. W. 2d 365, 369.

Minn. St. 253.21 would seem to provide authority to the commissioner of corrections analagous to that which Minn. St. 246.14 provides the commissioner of public welfare to "transfer" persons under his custody. No reason suggests itself why a transfer by the commissioner of corrections of a prisoner should "disturb" the incarceration and result in anything but concurrent custody exercised by both the commissioner of corrections and the commissioner of public welfare. Such a construction seems to comport more with the apparent legislative intent than does that urged by defendant. As another portion of the Advisory Committee Comment to § 609.485 states:

"The words 'in legal custody on a charge or conviction of a crime' includes everything from arrest, to confinement in a jail pending trial, to confinement in an institution following conviction." 40 M. S. A. 430 (1964).

There is no indication that "institution" refers only to the state prison. It more logically seems to refer to any institution in which the commissioner of corrections has authority to place a prisoner.

It seems clear that Minn. St. 609.485 was intended by the legislature to apply to escapes by persons being held in custody jointly by the commissioner of public welfare and the commissioner of corrections.

In reaching this conclusion we find further support in the opinion of the Supreme Judicial Court of Massachusetts in Commonwealth v. Reed, 364 Mass. 545, 306 N. E. 2d 816 (1974). In considering a case factually similar to the one at bar, a majority of the Massachusetts court stated:

"* * * [I]t is our view that, in interpreting escape statutes, there is justification for adopting a construction which permits the punishment of all escaping prisoners. * * * It would seem illogical to construe a legislative intent that although the pris-

oner was to get credit in the execution of his sentence for the term spent in [a] hospital, however, if he escaped from the hospital he was not considered to be in custody for the purpose of being punished." 364 Mass. 545, 547-548, 306 N. E. 2d 816, 818.

While in the instant case we do not have the benefit of such a clearly drawn statutory delineation of the status of a state prison inmate transferred to a state security hospital, we have concluded that a prisoner so transferred still remains "in lawful custody." In order to effectuate the over-all purpose of deterring and punishing all escaping prisoners, it is reasonable to conclude that the legislature intended Minn. St. 609.485 to apply to conduct such as defendant's.

(b) Applicability of Parole Exception.

Given application of the statute in fact to the conduct of defendant, does he nonetheless fall within the exception of subd. 3 of the statute?

It is conceded that defendant was on "medical parole" to MSH at the time of his escape. There is little in the record which reflects the exact nature of this type of transfer. We are, however, convinced from what evidence there is in the record that a "medical parole" is not a parole as that term is used in the statute, but rather is merely a temporary transfer for medical treatment, more analagous to a furlough than anything else. The use of the term "parole" is a misnomer. An inmate on "medical parole" does not fall within the parole exception of Minn. St. 609.485, subd. 3.

(c) Constitutionality.

Defendant asserts that, if it is determined that Minn. St. 609.485 applies to his conduct in fact and that the parole exception does not apply, such an application constitutes a denial of his right to equal protection of the law. He bases this claim on the following theory: That he is a member of the class of persons civilly committed to MSH; that the normal consequence of leaving MSH premises is that the patient is returned, without criminal penalty; that to apply penal consequences to his conduct is a differentiation which does not serve any legitimate govern-

mental purpose, and constitutes a denial of his rights under both the state and Federal constitutions.

In Schwartz v. Talmo, 295 Minn. 356, 205 N. W. 2d 318, appeal dismissed, 414 U. S. 803, 94 S. Ct. 130, 38 L. ed. 2d 39 (1973), we stated broadly the standards to be applied in considering a claimed denial of equal protection. Summarized, those standards require that a legislative classification apply uniformly to all persons similarly situated, and that the distinctions which separate those who are included in a classification from those who are not must not be arbitrary or fanciful, but rather must be natural and reasonable. Finally, the classification must be germane to a lawful objective. See, also, 3B Dunnell, Dig. (3 ed.) § 1700, and State v. Reps, 302 Minn. 38, 223 N. W. 2d 780 (1974).

In the instant case it is clear that defendant falls not only within the class of those persons civilly committed to MSH, but *also* in the class of persons in the custody of the commissioner of corrections who have been convicted of a criminal offense. The obvious, and unquestionably legitimate, legislative purpose behind applying the criminal sanctions of Minn. St. 609.485 to persons in the latter class is to keep those persons in custody until discharged by due course of law by deterring and punishing escapes.

2. *Sufficiency of Evidence.*

Defendant does not deny that his actions, if they fall at all within the proscription of Minn. St. 609.485 (that is, if he was in "lawful custody" and not merely held under civil commitment) constitute an escape as defined in the statute. But beyond that, defendant asserts that he lacked the requisite intent to be *guilty* of escape.

Under Minn. St. 609.485, the acts must be intentional and voluntary in order for the departure to constitute an escape. See, State v. Dinneen, 289 Minn. 250, 184 N. W. 2d 16 (1971). Defendant asserts that on the evidence presented the court could not have found beyond a reasonable doubt that he was able to form the requisite intent at the time of his departure. Defendant

also contends that he established his insanity by a preponderance of the evidence, and seems to assert this as a defense somehow distinct from lack of capacity. However, since the two theories are similar, and are based upon the same adjudicative facts, we consider them together.

Defendant bases his claim of lack of capacity on the testimony of two witnesses, Merle Campbell, defendant's companion in the escape, and Norman Holby, another inmate of Stillwater, who was with both defendant and Campbell at MSH at the time of the escape. Their testimony, defendant asserts, established that he had reverted to his delusional state on the night of the escape and that he left MSH under the influence of a delusional compulsion. The testimony of these two individuals was at best inconsistent, and at times conflicted as to the details of the events of the night in question, a factor that the trial court considered in weighing the testimony. The court also heard the contradictory testimony of Dr. Gerald Ziesemer, who examined defendant 5 days before the escape and found him to be stable, aggressive, and without delusional tendencies. Mere evidence that an individual charged with a crime was suffering from a mental illness does not act to excuse that person from criminal liability, unless the mental illness caused such a defect of reason that the defendant did not know the nature of his act or that it was wrong. State v. Bott, 310 Minn. 331, 246 N. W. 2d 48 (1976). The trial court specifically found that there was not a "mental state on the 10th of June, which would eliminate criminal responsibility." On appeal, this finding does not appear to be clearly erroneous. Additionally, the trial court found that irrespective of defendant's mental condition at the time of the escape, there was sufficient evidence for the court to conclude that he was equally guilty under the statute for his failure to return to custody.

Defendant asserts that in making this finding the court was indulging in mere speculation, in that no evidence was presented regarding defendant's conduct and mental condition between the time of his escape and the time of his recapture which could

provide a basis for the court's conclusion. However, the trial court did base this finding on facts in evidence, namely defendant's mental condition upon his return to MSH.

At oral argument, counsel for defendant asserted that defendant's condition upon his return necessitated heavy dosages of antipsychotic drugs on an emergency basis, indicating that defendant was delusional upon his return. We have carefully re-examined the record, and it appears that whatever medication defendant received upon his return was prescribed not to treat delusional behavior, but rather was administered to relieve feelings of anxiety that defendant was experiencing. This is in accord with the trial court's findings that defendant's mental capacity just prior to his recapture was not delusional. Additionally, it appears that the court felt that its first finding, that defendant was responsible for his acts in leaving the hospital, was sufficient for conviction. The two findings are obviously not inconsistent.

3. *Assistance of Counsel.*

At the last of three pretrial hearings defendant appeared without his counsel to that date, Mr. Howard Haugh. At that hearing the court found, inter alia, that a report received from the Sioux Trails Clinic regarding defendant's competency to stand trial failed to show that defendant was incompetent. It is asserted that the trial court, in making this finding without defense counsel present, denied defendant his right to assistance of counsel.

The situation which occurred on October 8, 1974, must be viewed in perspective with the proceedings at the prior pretrial hearings.

At the July 23, 1974, arraignment of defendant, his counsel requested a psychological evaluation of defendant, directed at both his sanity at the time of the offense and his competency to stand trial. An examination was ordered.

On August 6, 1974, having received a letter from defendant alleging mistreatment at the hands of his jailers, the court or-

dered defendant to appear before it with counsel. The allegations in the letter were discussed, testimony was taken from both defendant and the jailers, and the court found the allegations to be baseless. It was on this occasion that defendant advised the court that he desired either a change in counsel or to proceed pro se. The court agreed to allow defendant to continue his efforts to retain private counsel, on the condition that it not delay the trial.

On August 8, 1974, the day set for trial, defendant appeared again with Mr. Haugh. Two issues principally concerned the court: First, who would represent defendant, and second, whether further psychiatric examinations should be conducted. The first issue was never resolved. As to defendant's competency, the examination which had been ordered on July 23, 1974, had been conducted and the results made available to counsel for defendant. Counsel was satisfied from the report that defendant was competent. Defendant on the other hand felt that the examination had not been adequately conducted and demanded another examination. The second psychological evaluation was reluctantly ordered by the court after an extended colloquy with defendant, and then only when the county attorney urged the court to grant the request in order to foreclose any question of defendant's competency. The trial court judge indicated on the record his strong feeling that there was no question that defendant was competent to stand trial. The trial date was, nonetheless, continued to allow for this second examination.

The proceedings on October 8, 1974, must be viewed against this background.

On October 8, defendant appeared without counsel. The court was under the impression that Mr. Haugh had been dismissed by defendant, and the principal purpose of that hearing was to determine who would represent him. Eventually another public defender was appointed.

The matter of defendant's competency to stand trial was really not a central issue. The trial court found nothing in the new

psychological report which altered its earlier determination that defendant was competent to stand trial. The court did, however, allow the county attorney to comment on the report and defendant's competency. Additionally, an exchange took place between the court and defendant in which the court advised defendant of the possible effects of a finding of incompetency (as being hospitalization until the accused was found competent, and then trial in any event). The court stated that it was better for defendant that the court found him to be competent, so that the trial could proceed.

In his brief, defendant categorizes this conversation as an adversary confrontation in which he stood alone against the state and the court, and was "frightened" into agreeing that he was competent to stand trial. Read in context, it appears that the court was merely trying to explain to defendant the effect of a finding of competency and what alternatives the court had rejected.

We do not approve of the absence of counsel at the October 8, 1974, appearance. We feel that counsel should have been present before the court proceeded, even though it appears that a valid determination of competency had already been made at the earlier hearing. However, viewing the incident in context, it seems certain that defendant was competent to stand trial, and any error was, at best, harmless.

4. *Speedy Trial.*

Defendant was returned to custody on October 30, 1973; he was not charged with the offense of escape until May 14, 1974. He was not tried until October 29, 1974. This delay, defendant contends, amounted to an abridgment of his right to a speedy trial under the Sixth Amendment to the United States Constitution.

In his brief, defendant argues that the due process guaranty of the Fifth Amendment was also violated by this delay. The Sixth Amendment guaranty of a speedy trial becomes operative upon the accusation of the defendant. Such accusation occurs

not only by indictment or complaint, but also by arrest. United States v. Marion, 404 U. S. 307, 92 S. Ct. 455, 30 L. ed. 2d 468 (1971). In the instant case, the Sixth Amendment became operative upon defendant's arrest and return to this jurisdiction on October 30, 1973. There is no evidence that prior to that time the prosecuting authority knew of his whereabouts yet intentionally refused to initiate prosecution. Such conduct, if it had occurred, would be a possible basis for defendant's Fifth Amendment claim, United States v. Marion, 404 U. S. 307, 324, 92 S. Ct. 455, 465, 30 L. ed. 2d 468, 481. (See, also, Ross v. United States, 121 App. D. C. 233, 349 F. 2d 210 [1965], relied upon heavily by defendant, and State v. Bellcourt, 293 Minn. 446, 196 N. W. 2d 610 [1972]). In the absence of such a showing, our consideration is limited to defendant's Sixth Amendment rights.

Minn. St. 253.13 requires the director of MSH to notify the warden of the prison of any escape. This is presumably the first step in the process of preparing charges against the escapee. There apparently was some delay in initiating this step. Dr. Sheppard testified that defendant's escape was the first one he had experienced as director of MSH, and that he attempted to "* * * bring this to the attention of the court" via telephone calls beginning as early as October or November 1973. He finally wrote to the county attorney, but unfortunately there is no indication in the record as to the date of this correspondence.

The standard by which a claimed denial of the right to a speedy trial should be judged is well set out in United States v. Dowl, 394 F. Supp. 1250, 1251 (D. C. Minn. 1975). That court said:

"The difficulty of determining when a defendant has been denied speedy trial is caused by the vagueness of the concept and the inability to define with precision the exact number of months or years which amount to denial. Barker v. Wingo, *supra*, 407 U. S. at 521, 92 S. Ct. 2182. Due to this imprecision, the Supreme Court has formulated a balancing test that should be ap-

plied in an effort to weigh the conduct of the prosecution and that of the defendant.

"A balancing test necessarily compels courts to approach speedy trial cases on an *ad hoc* basis. We can do little more than identify some of the factors which courts should assess in determining whether a particular defendant has been deprived of his right. Though some might express them in different ways, we identify four such factors: Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant. Id. at 530, 92 S. Ct. 2912."

Applying those factors to the instant case, we find that the crucial delay in this case was the 7-month period between the time defendant was returned to MSH and the date formal charges were filed against him. Prior to that time he was not in custody and his whereabouts were unknown; subsequent to that time his prosecution proceeded with sufficient dispatch, and any delays were at the request of the defendant. The reason for the 7-month delay is somewhat more problematical. It appears not to have been an intentional tactic as intimated by defendant's counsel on appeal, but rather merely a difficulty in communication between MSH and the appropriate prosecuting authorities. Such delays are not uncommon, but nonetheless cannot be tolerated if they work a prejudice to an accused's ability to defend himself. The extent to which defendant asserted his right to a speedy trial (a factor weighed heavily by this court in other contexts, e. g. State v. Borough, 287 Minn. 482, 178 N. W. 2d 897 [1970]), does not seem to be an appropriate consideration in this case.

The final element, the extent of prejudice the delay caused defendant, is obviously both the most important and the most difficult to assess. Defendant claims that the delay made it more difficult to establish his mental condition at the time of the offense. At trial, his only two witnesses regarding his mental state testified in a confident, coherent (if inconsistent) manner, seemingly unaffected by the delay. No expert testimony was

proffered, although two pretrial examinations were conducted. We might hypothesize, as defendant does, that had those examinations been conducted several months earlier they would have produced different results. It seems much more likely, however, that there would have been no difference. Both examinations appeared to rely heavily on defendant's MSH records and an evaluation of his then present state of mind. The records clearly did not change, and there is no evidence that defendant's mental state altered substantially, between November 1973 and June 1974.

On balance, it seems as though the delay, though not to be condoned, was not so prejudicial as to require a dismissal of the charges against defendant.

The conviction of the defendant is affirmed.

YETKA, JUSTICE (dissenting).

I respectfully dissent. At oral argument the county attorney stated that although the escape statute involved in this case was not intended to apply to a patient who is under direct civil commitment by a court to a mental institution, it was intended to apply to one who has been previously sentenced to a prison, and then transferred from that prison by commitment order to a mental institution.

If the purpose of the statute is to discourage attempted escape from a mental institution on the theory that the public is in danger from an escapee, why should the statute not apply equally to either patient, that is, one committed from a prison or one committed directly under a civil commitment order? Moreover, if the one under a civil commitment order who attempts to escape is not guilty of a crime on the theory that he is a patient in a mental institution and therefore should be deemed to not have the capacity to commit the offense, how can the patient there under commitment from a prison be any more responsible for his actions?

It appears to me that the statute should be applied equally to either patient, or to neither.

There was a rather strong statement made at oral argument to the effect that the Minnesota Security Hospital authorities make every effort to discourage difficult patients being transferred to it from our prison system. If this is true, that position is regrettable because there are certainly more adequate facilities for treating mental patients at St. Peter than at Stillwater or St. Cloud. We must not lose sight of the fact that while one is a patient in a mental institution there is always a chance for a cure. The proof in this case is the fact that Knox was able to function on medical parole while at St. Peter. If he never got beyond that stage, it would appear preferable to sending him back to Stillwater where the inevitable remission would take place and he would once again become a danger to fellow inmates and to prison authorities. Moreover, what protection is there to the public when his sentence expires and he is eventually released?