*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-0664**

State of Minnesota,
Respondent,

vs.

Sheikh Nyane,
Appellant.

**Filed September 28, 2015
Affirmed
Reilly, Judge**

Anoka County District Court
File No. 02-CR-10-4660

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Anthony C. Palumbo, Anoka County Attorney, Andrew T. Jackola, Assistant County Attorney, Anoka, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Chang Y. Lau, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Johnson, Presiding Judge; Kirk, Judge; and Reilly, Judge.

**U N P U B L I S H E D   O P I N I O N**

**REILLY**, Judge

In this combined direct and postconviction appeal, appellant argues that he is entitled to withdraw his guilty plea to attempted first-degree murder because the plea was

inaccurate and involuntary, the plea was induced by an unfulfilled promise by the state, and he received ineffective assistance of counsel. We affirm.

## FACTS

Appellant Sheikh Nyane was charged with first- and second-degree assault and attempted first- and second-degree murder. The state alleged that Nyane went to victim T.M.'s office and stabbed her repeatedly with a knife, inflicting numerous critical injuries. T.M. was an attorney representing Nyane's ex-wife, and Nyane had recently lost legal and physical custody of his son to his ex-wife. Nyane was found incompetent to proceed to trial on two occasions before the district court determined that he was competent to proceed to trial based on a psychologist's report.

On the morning that trial was scheduled to begin, the prosecutor and defense counsel informed the district court that Nyane had agreed to plead guilty to attempted first-degree murder. The state agreed to dismiss the remaining charges, withdraw its motion for an upward sentencing departure, and cap the sentence at 200 months, with credit given for the time that Nyane had spent in jail and had spent or would spend in secure mental health facilities. The defense was free to request a lesser sentence. The prosecutor also stated:

> [A]s part of this agreement the state is agreeing to refer Mr. Nyane to prepetition screening on the question of whether or not Mr. Nyane is mentally ill and dangerous. . . . The basic idea, Your Honor, is that we're referring him to that which is outside of our office. They will conduct their normal prepetition investigation into whether it fits their standard in their mind. They will then make the recommendation on whether or not Mr. Nyane should be petitioned to be . . . committed as mentally ill and dangerous or not. Whatever

2

their determination is that's their determination. County Attorney's Office makes no guarantee about what it is.

The district court clarified: "And so whatever that decision is, it's not really affecting the plea agreement." The prosecutor responded:

> Right. The basic here is the State agrees to get the ball rolling and talk to the folks in the prepetition screening and wherever it goes from there we'll find out. If for some reason at the end of that rainbow [Nyane] winds up in a locked mental health facility, which the State isn't saying that's going to happen, but if he did, we would agree he gets credit for that.

Defense counsel affirmed "that is our understanding of the plea arrangement" and further stated:

> Essentially I think what the spirit of our agreement is, is that there are a lot of elements . . . which are outside of the control of the Anoka County Attorney's Office. Mr. Nyane will be referred for prepetition screening. There will be a psychologist who will meet with him. The case, if he is in fact petitioned for commitment as mentally ill and dangerous the petition would have to come back before a civil court. A lot of steps in that process are outside of the control of the Anoka County Attorney's [O]ffice. The spirit of our agreement is as [the prosecutor] said, they will get the ball rolling. My understanding is that if he is appropriate for commitment or if he's found to be appropriate for commitment their office is not going to stand in the way of that. They will perform their usual function. Our understanding is that much of that function is outside the control of their office, and we understand that. That's part of our agreement.

The parties offered into the record an e-mail in which the prosecutor had made the plea offer, and the parties agreed that the e-mail accurately described the plea agreement that Nyane was accepting.

3

Nyane confirmed that he understood and wished to accept the plea agreement, had enough time to speak with his attorney, and was advised of his rights and the consequences of a plea. He also confirmed that he understood and wished to give up his rights associated with a trial. He pleaded guilty to attempted first-degree murder. Turning to the factual basis for the plea, Nyane stated that he found the address for the office building of his ex-wife's attorney T.M. on some legal documents. He stated that he drove to the office building because his "son was taken [in] the custody battle," he believed that T.M. was "the one who [was] taking [his] son," and he was "more than angry." He admitted that he brought along a knife from his kitchen. He stated that he took the knife to T.M.'s office and stabbed her but that he did not remember where on her body, how many times, or for how long he stabbed her. Nyane admitted that he "was just kind of like swinging" and that he "remember[ed] seeing blood." He stated that the knife broke while he was in the office but that he did not remember how it broke. He asserted that he did not intend to kill T.M. and that he told her, "I don't want to kill you."

The prosecutor expressed concern about Nyane's refusal to admit to the element of intent, and the district court and attorneys agreed to proceed by way of "an *Alford* type plea." The prosecutor stated that T.M. would testify at a trial. Based on T.M.'s statements to the police, the prosecutor predicted that T.M. would testify that Nyane "stabb[ed] her over and over and over again" while "he told her . . . that he was going to kill her." T.M. was also expected to testify that Nyane "was sawing at the base of her neck" with the knife. The prosecutor referenced T.M.'s medical records and photographs of T.M.'s injuries. The prosecutor stated that T.M. had "approximately 20 wounds to her

head area" and that she was also stabbed in the neck, shoulder, chest, and "right and left flanks," sustaining a total of approximately 30 stab wounds. He stated that T.M. underwent a number of surgeries for her injuries and that pieces of the knife were found in her forehead during surgery.

Nyane affirmed that he heard the evidence presented by the prosecutor. Defense counsel explained to Nyane that he was not being asked to admit he intended to kill T.M. and that "we're going to let the Judge make a ruling about what your intent was . . . based on all of the evidence that we heard in Court." Defense counsel asked whether Nyane agreed that there was a substantial likelihood that a jury would find him guilty of attempted first-degree murder based on the evidence. Nyane became agitated, stating that he was confused, that he did not intend to kill anyone, and that he did not know what a jury would decide. He began to talk about his anger over the loss of custody of his son. The transcript of the hearing reflects that Nyane went "out of control," and a recess was taken. Back on the record, defense counsel asked Nyane to "b[ear] with me just for a couple more questions here." Nyane stated that he was tired and "want[ed] to go back." He became agitated again, stating, "Whatever you said. Guilty, guilty, guilty, guilty." and, "Give them everything they want." The district court declared a recess for lunch.

The parties returned to court that afternoon, and Nyane and defense counsel apologized for the earlier outbursts. Defense counsel asked several more times whether Nyane agreed that there was a substantial likelihood that a jury would find him guilty based on the evidence. Nyane again expressed confusion over these questions, stating that he did not have control over a jury and, "I don't know because it's up to them, you

know. I mean I don't know what the jury is going to say or what the jury is not going to say." After conversing with defense counsel, Nyane eventually responded "[y]es" when asked whether he thought "there's a substantial likelihood that a jury would find you guilty if they heard all of this evidence." The district court accepted the plea. Nyane was later sentenced to a 200-month prison commitment.

Nyane filed a direct appeal challenging the accuracy and voluntariness of his guilty plea. The appeal was stayed to permit postconviction proceedings, and Nyane filed a postconviction petition in district court requesting an evidentiary hearing and plea withdrawal. He argued that his plea was induced by the state's unfulfilled promise that he would be screened for civil-commitment proceedings. He also argued that he received ineffective assistance of counsel, claiming that defense counsel told him that he "would have an opportunity to be civilly committed in lieu of being imprisoned" if he pleaded guilty, that defense counsel then "failed to take the necessary steps to ensure" that he was screened for civil-commitment proceedings before sentencing, and that after being sentenced and imprisoned he "did not have a feasible chance of being civilly committed." The district court denied Nyane's requests for an evidentiary hearing and postconviction relief, and the appeal was reinstated. Nyane also appeals the district court's postconviction decision.

## DECISION

### I.

Nyane argues that he is entitled to plea withdrawal because his plea was inaccurate and involuntary and therefore invalid. Manifest injustice exists if a plea is not valid, and

6

a court must allow plea withdrawal when necessary to correct manifest injustice. *Barrow v. State*, 862 N.W.2d 686, 691 (Minn. 2015) (citing Minn. R. Crim. P. 15.05, subd. 1). A plea must be accurate, voluntary, and intelligent to be valid. *State v. Raleigh*, 778 N.W.2d 90, 94 (Minn. 2010). Assessing the validity of a plea presents a question of law that is reviewed de novo. *Lussier v. State*, 821 N.W.2d 581, 588 (Minn. 2012).

## A.    Accuracy

A person is guilty of first-degree murder if he "causes the death of a human being with premeditation and with intent to effect the death of the person or of another." Minn. Stat. § 609.185(a)(1) (2008); *see also* Minn. Stat. § 609.17, subd. 1 (2008) ("Whoever, with intent to commit a crime, does an act which is a substantial step toward, and more than preparation for, the commission of the crime is guilty of an attempt to commit that crime . . . ."). Nyane argues that his plea to attempted first-degree murder was inaccurate because the factual basis on record was insufficient to establish the elements of intent and premeditation.

The requirement that a plea be accurate "protect[s] a defendant from pleading guilty to a more serious offense than that for which he could be convicted if he insisted on his right to trial." *Lussier*, 821 N.W.2d at 588 (quotation omitted). For a plea to be accurate, a proper factual basis must be established by the record. *Id.* "The factual basis must establish sufficient facts on the record to support a conclusion that defendant's conduct falls within the charge to which he desires to plead guilty." *Munger v. State*, 749 N.W.2d 335, 338 (Minn. 2008) (quotation omitted).

7

A district court may accept a guilty plea even though the defendant maintains his innocence through what is known as an *Alford* plea. *State v. Theis*, 742 N.W.2d 643, 647 (Minn. 2007) (citing *North Carolina v. Alford*, 400 U.S. 25, 37, 91 S. Ct. 160, 167 (1970)); *see also State v. Goulette*, 258 N.W.2d 758, 760-61 (Minn. 1977) (recognizing the use of *Alford* pleas in Minnesota). An *Alford* plea is a plea where "the defendant, despite maintaining his innocence, agrees that evidence the State is likely to offer at trial is sufficient to convict" and the district court "independently conclude[s] that there is a strong probability that the defendant would be found guilty of the charge to which he pleaded guilty, notwithstanding his claims of innocence." *Theis*, 742 N.W.2d at 649 (emphasis omitted). The state must "demonstrate[] a strong factual basis for the plea" on the record for an *Alford* plea, and this factual basis may be established through discussion of the evidence with the defendant, recitation by counsel of some of the key evidence that would be offered at a trial, introduction of evidence into the record, presentation of abbreviated testimony from witnesses, or stipulation by the parties to a factual statement submitted to the district court. *Id*. at 647-49 (quotation omitted).

### i. Intent

"'With intent to' . . . means that the actor either has a purpose to do the thing or cause the result specified or believes that the act, if successful, will cause that result." Minn. Stat. § 609.02, subd. 9(4) (2008). Intent is a state of mind that is generally proven circumstantially "by drawing inferences from the defendant's words and actions in light of the totality of the circumstances." *State v. Cooper*, 561 N.W.2d 175, 179 (Minn. 1997) (stating that it may be inferred "that a person intends the natural and probable

consequences of his actions"); *see also State v. Cruz-Ramirez*, 771 N.W.2d 497, 509 (Minn. 2009) ("Intent [to murder] may be inferred from the manner of the killing."); *State v. Raymond*, 440 N.W.2d 425, 426 (Minn. 1989) (stating that "[i]ntent to cause the result of [victim]'s death could be inferred from the nature and extent of the [stab] wounds and the fact that defendant left her to bleed to death").

The factual basis for the plea was established through Nyane's admissions, discussion of the evidence with Nyane, and the prosecutor's recitation of key evidence that would be presented at a trial. Nyane admitted that he drove to T.M.'s office because he had lost custody of his son, believed that T.M. had taken his son, and was very angry. He admitted that he took a knife with him to the office and stabbed T.M. He remembered that he "was just kind of like swinging" and that the knife broke while he was in the office.[1] The prosecutor summarized the testimony that T.M. would offer at a trial. She was expected to testify that Nyane stabbed her repeatedly, "saw[ed] at the base of her neck" with the knife, and told her that he was going to kill her. The prosecutor also summarized T.M.'s injuries based on her medical records and photographs of the injuries. He stated that T.M. sustained approximately 30 stab wounds to various parts of her body, that she underwent a number of surgeries for her injuries, and that pieces of the knife were found in her forehead during surgery. Although Nyane denied intending to kill T.M., he agreed that there was a substantial likelihood that a jury would find him guilty

---

[1] We note that this was an unusual *Alford* plea because Nyane admitted to the stabbing while denying that he possessed the mens rea necessary for attempted first-degree murder.

based on the evidence. There was a strong factual basis on the record on which to conclude that Nyane intended to kill T.M.

### ii. Premeditation

"'[P]remeditation' means to consider, plan or prepare for, or determine to commit, the act referred to prior to its commission." Minn. Stat. § 609.18 (2008). "Premeditation requires some amount of time to pass between formation of the intent and the carrying out of the act," but proving premeditation does not require "proof of extensive planning or preparation to kill" or "any specific period of time for deliberation." *State v. Palmer*, 803 N.W.2d 727, 734 (Minn. 2011) (quotation omitted); *see also Raleigh*, 778 N.W.2d at 94 ("To prove premeditation, the facts must establish that some appreciable period of time passed after the defendant formed the intent to kill, during which the statutorily required consideration, planning, preparation, or determination took place." (quotation omitted)). Like intent, premeditation is "a state of mind generally proved circumstantially by drawing inferences from a defendant's words and actions in light of the totality of the circumstances." *Cruz-Ramirez*, 771 N.W.2d at 509 (stating that premeditation to murder may be inferred where there is "(1) planning activity shown by the defendant's actions prior to the actual killing; (2) motive inferred from the defendant's prior relationship with the victim; or (3) evidence as to the nature of the killing from which it can be inferred that the killing was premeditated").

Nyane admitted that he had lost custody of his son, believed that T.M. had taken his son, and was very angry. He admitted that he found the address for T.M.'s office on some legal documents, drove to the office with a knife from his kitchen, and stabbed

T.M. The prosecutor stated that T.M. would testify at a trial that she sustained multiple stab wounds and that Nyane told her while he was stabbing that he was going to kill her. Nyane agreed that there was a substantial likelihood that a jury would find him guilty based on the evidence. There was a strong factual basis on the record on which to conclude that Nyane premeditated to kill T.M. We conclude that Nyane's *Alford* plea was supported by a strong factual basis and was accurate.

## B.      Voluntariness

The requirement that a plea be voluntary "ensures a defendant is not pleading guilty due to improper pressure or coercion," and "[w]hether a plea is voluntary is determined by considering all relevant circumstances." *Raleigh*, 778 N.W.2d at 96. Nyane first argues that his plea was involuntary because he "did not expressly or impliedly agree to plea[d] by way of an *Alford* plea, nor did he acknowledge that he understood what an *Alford* plea entailed." Nyane acknowledges, however, that caselaw has not required a defendant to agree on the record to proceed by way of an *Alford* plea for such a plea to be valid.

Nyane expressed his desire to plead guilty to attempted first-degree murder pursuant to the plea agreement, but he denied intending to kill T.M. The attorneys and the district court then approved of proceeding by way of an *Alford* plea. Defense counsel explained to Nyane that the plea would be an *Alford* plea, that Nyane was not being asked to admit to intending to kill T.M., and that "we're going to let the Judge make a ruling about what your intent was . . . based on all of the evidence that we heard in Court." The prosecutor summarized the evidence that the state would offer at a trial, and Nyane

agreed that there was a substantial likelihood that a jury would find him guilty based on the evidence. Defense counsel explained the mechanism of an *Alford* plea to Nyane, and we decline to hold that Nyane's plea was involuntary because he did not explicitly agree on the record to proceed by way of an *Alford* plea.

Nyane also argues that his plea was involuntary because he "informed the district court that he did not wish to continue with his plea," but "[h]is requests to end the proceeding were completely ignored." The record of the plea hearing does not support Nyane's argument. Nyane expressed confusion and became agitated when asked whether there was a substantial likelihood that the jury would find him guilty based on the evidence. A recess was taken after Nyane became upset talking about the loss of custody of his son. When Nyane became agitated again after the recess, the district court declared another recess for lunch. After lunch, Nyane and defense counsel apologized for the earlier outbursts and indicated a desire to proceed. Contrary to Nyane's assertion on appeal, the record does not reflect that he informed the district court that he no longer wished to enter his plea. We conclude that Nyane's plea was voluntary.

## II.

Nyane challenges the district court's denial of postconviction relief and an evidentiary hearing. "When a defendant initially files a direct appeal and then moves for a stay to pursue postconviction relief, we review the postconviction court's decisions using the same standard that we apply on direct appeal." *State v. Beecroft*, 813 N.W.2d 814, 836 (Minn. 2012). A denial of a request for a postconviction evidentiary hearing is reviewed for an abuse of discretion. *Hooper v. State*, 838 N.W.2d 775, 786 (Minn.

12

2013). A district court need not hold a hearing on a postconviction petition if "the petition and the files and records of the proceeding conclusively show that the petitioner is entitled to no relief." Minn. Stat. § 590.04, subd. 1 (2014); *see also Powers v. State*, 695 N.W.2d 371, 374 (Minn. 2005) ("An evidentiary hearing is not required unless there are material facts in dispute that must be resolved to determine the postconviction claim on its merits.").

## A. A Promise Inducing the Plea

Nyane argues that he is entitled to plea withdrawal because he was induced to plead by the state's unfulfilled promise that he would go through a prepetition civil-commitment screening. "Determining what the parties agreed to in a plea bargain is a factual inquiry for the [district] court to resolve. But interpretation and enforcement of plea agreements involve issues of law that we review de novo." *State v. Rhodes*, 675 N.W.2d 323, 326 (Minn. 2004) (citation omitted), *cert. denied*, 543 U.S. 882, 125 S. Ct. 134 (2004).

"When a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." *James v. State*, 699 N.W.2d 723, 728 (Minn. 2005) (quotation omitted) (stating that the government's breach of such a promise violates due process). "Inducement of a guilty plea by promises that cannot be fulfilled invalidates the plea; possible remedies include requiring performance of the agreement, altering the sentence, or allowing the plea to be withdrawn." *State v. Jumping Eagle*, 620 N.W.2d 42, 43 (Minn. 2000); *see also Perkins v. State*, 559 N.W.2d 678, 689 (Minn. 1997) (stating

13

that plea withdrawal may be appropriate where an unqualified promise in a plea agreement is dishonored but not where the defendant merely "has not achieved an unwarranted hope" (quotation omitted)).

Principles of contract interpretation are used to interpret a plea agreement. *In re Ashman*, 608 N.W.2d 853, 858 (Minn. 2000). A plea agreement is ambiguous if it is "susceptible to more than one construction," and whether a plea agreement is ambiguous is a legal determination that is reviewed de novo. *Id.* at 858-59 (reviewing all expressions of a plea agreement to determine whether there was ambiguity).

During the plea hearing, the prosecutor stated: "[A]s part of this agreement the state is agreeing to refer Mr. Nyane to prepetition screening on the question of whether or not Mr. Nyane is mentally ill and dangerous. . . . The basic idea, Your Honor, is that we're referring him to that which is outside of our office." The prosecutor further stated: "The basic here is the State agrees to get the ball rolling and talk to the folks in the prepetition screening and wherever it goes from there we'll find out." Defense counsel stated:

> Essentially I think what the spirit of our agreement is, is that there are a lot of elements . . . which are outside of the control of the Anoka County Attorney's Office. Mr. Nyane will be referred for prepetition screening. . . . A lot of steps in [the civil-commitment] process are outside of the control of the Anoka County Attorney's [O]ffice. The spirit of our agreement is as [the prosecutor] said, they will get the ball rolling. . . . They will perform their usual function. Our understanding is that much of that function is outside the control of their office, and we understand that. That's part of our agreement.

14

The prosecutor's e-mail making the plea offer stated: "On the topic of civil commitment the Anoka County Attorney[']s [O]ffice agrees to refer Mr. Sheikh Nyane to Anoka County Adult Mental Health for review and pre-petition screening on the issue of whether Mr. Sheikh Nyane is a mentally ill and dangerous person." After the plea hearing and sentencing, the prosecutor sent a letter to the Anoka County Mental Health Department referring Nyane for a prepetition civil-commitment screening. The department responded that Ramsey County was financially responsible for Nyane and was the proper civil-commitment venue. Nyane has not gone through a prepetition screening.

Nyane acknowledges that the state did not promise that a civil-commitment proceeding would commence or that he would be civilly committed, but he argues that his plea was induced by the state's promise that he would go through a prepetition screening. Nyane points to several statements to support his contention that the plea agreement included a promise that he would go through a screening. During the plea hearing, the prosecutor stated: "They will conduct their normal prepetition investigation into whether it fits their standard in their mind. They will then make the recommendation on whether or not Mr. Nyane would be petitioned to be . . . committed as mentally ill and dangerous or not." In summarizing his understanding of the plea agreement, defense counsel stated: "There will be a psychologist who will meet with him." And the prosecutor's e-mail making the plea offer stated: "The Anoka County Adult Mental Health Pre-Petition Screening will then conduct a review and make an independent determination on whether Anoka County Adult Mental Health recommends Mr. Sheikh

15

Nyane be petitioned for civil commitment as a mentally ill and dangerous person." But all of these statements were made against the backdrop of an understanding that the Anoka County Attorney's Office had no control over prepetition screening.

All of the recitations of the plea agreement viewed together show that the plea agreement is unambiguous and that the state promised only to refer Nyane for a prepetition screening. The prosecutor and defense counsel indicated that the Anoka County Attorney's Office was agreeing to "get the ball rolling" by "talk[ing] to the folks in the prepetition screening" and that the office had no control over "wherever it goes from there" because the referral was being made "to that which is outside of [the] office." While it appears that the parties envisioned Nyane actually going through a prepetition screening, they understood and acknowledge that the Anoka County Attorney's Office had no authority over the screeners. The state fulfilled its promise by writing to the Anoka County Mental Health Department and referring Nyane for a prepetition screening. Nyane's plea was not induced by a promise that has gone unfulfilled, and he is not entitled to an evidentiary hearing or postconviction relief on this basis.

## B.     Ineffective Assistance of Counsel

Nyane argues that he is entitled to plea withdrawal because he received ineffective assistance of counsel and was induced to plead by inaccurate information from defense counsel. A claim of ineffective assistance of counsel involves a mixed question of fact and law and is reviewed de novo. *State v. Hokanson*, 821 N.W.2d 340, 357 (Minn. 2012).

A criminal defendant has a constitutional right to the effective assistance of counsel. *Fort v. State*, 861 N.W.2d 674, 677 (Minn. 2015). To prevail on a claim of ineffective assistance of counsel, a defendant must show "(1) that his counsel's representation 'fell below an objective standard of reasonableness'; and (2) 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Nissalke v. State*, 861 N.W.2d 88, 94 (Minn. 2015) (quoting *Strickland v. Washington*, 466 U.S. 668, 688, 694, 104 S. Ct. 2052, 2064, 2068 (1984)); *see also Hawes v. State*, 826 N.W.2d 775, 783 (Minn. 2013) (stating that a reviewing court need not address both parts of the *Strickland* test if one is determinative). "The objective standard of reasonableness is defined as representation by an attorney exercising the customary skills and diligence that a reasonably competent attorney would perform under similar circumstances." *State v. Vang*, 847 N.W.2d 248, 266 (Minn. 2014) (quotation omitted) (noting that "counsel's performance is presumed to be reasonable"). A defendant's plea may be rendered constitutionally invalid if he received ineffective assistance of counsel. *Campos v. State*, 816 N.W.2d 480, 484 (Minn. 2012).

Nyane asserted in his postconviction affidavit that defense counsel told him that he "would have an opportunity to be civilly committed in lieu of being imprisoned with the Commissioner of Corrections if [he] entered a guilty plea." He argues that the legal representation he received fell below an objective standard of reasonableness because defense counsel "failed to take the necessary steps to ensure [that he] received a prepetition screening before he was committed to the department of corrections," and he "d[oes] not have a feasible chance of being civilly committed" now that he is in prison.

17

Even if we assume that defense counsel did tell Nyane that he would have an opportunity to be civilly committed if he pleaded, Nyane points to no authority or support in the record indicating that he does not have an opportunity to be civilly committed. The statutes contemplate that an inmate may be civilly committed for mental illness before his prison sentence is complete. *See* Minn. Stat. § 253B.18, subd. 2 (2014) (stating that a written treatment report must be filed after a person civilly committed for mental illness is admitted to a secure treatment facility "[i]f the person is in the custody of the commissioner of corrections when the initial [civil] commitment is ordered"); *id.*, subd. 4b (2014) (stating that, absent special approval, a person civilly committed for mental illness to a secure treatment facility is not eligible for a release pass if the person "is subject to a commitment to the commissioner of corrections"). The supreme court has stated that "[t]he concept that a person who has been both civilly committed and sentenced to a term of imprisonment might be in the custody of both the Department of Public Welfare and the commissioner of corrections has been expressly embraced by this court."[2] *State v. Knox*, 311 Minn. 314, 319, 250 N.W.2d 147, 152 (1976) (examining a situation where the appellant was civilly committed as mentally ill while imprisoned and was simultaneously serving his civil and criminal commitments); *cf. In re Civil Commitment of Nielsen*, 863 N.W.2d 399, 400-03 (Minn. App. 2015) (explaining that a petition to civilly commit a person to the Minnesota Sex Offender Program may be filed

---

[2] *See Dep't of Human Servs. v. Muriel Humphrey Residences*, 436 N.W.2d 110, 112 (Minn. App. 1989) (noting that the Department of Public Welfare was the predecessor to the Department of Human Services), *review denied* (Minn. Apr. 26, 1989).

even though the person is imprisoned and that a person can dually serve a criminal commitment and a civil sex-offender commitment), *review denied* (Minn. Apr. 14, 2015).

Nyane has not shown that defense counsel provided inaccurate information and representation that fell below an objective standard of reasonableness. Because Nyane has not established the first part of the *Strickland* test, we need not analyze the second part of that test to conclude that he did not receive ineffective assistance of counsel. Nyane is not entitled to an evidentiary hearing or postconviction relief on this basis.

**Affirmed.**